Amber A. Logan, CSB #166395
**LOGAN MATHEVOSIAN & HUR, LLP**
Equitable Plaza, Suite 2740
3435 Wilshire Boulevard
Los Angeles, California 90010-1901
(213) 365-2703
lmh@lmhfirm.com
amberlogan@lmhfirm.com

Attorney for Defendants, County of Los Angeles
Deputy John Roth and Deputy Wyatt Waldron

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANA PATRICIA FERNANDEZ, | CASE NO. 2:20-cv-9876-DMG-PDx |
| Plaintiff, | **DEFENDANTS COUNTY OF LOS ANGELES, JOHN ROTH AND WYATT WALDRON'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT** |
| vs. | |
| LOS ANGELES COUNTY; et al., | |
| Defendants. | |
| | Date: May 10, 2024 |
| | Time: 2:00 p.m. |
| | Place: Courtroom 8C |
| | Judge: Hon. Dolly M. Gee |

Defendants, COUNTY OF LOS ANGELES, JOHN ROTH and WYATT WALDRON hereby submit the following as its Memorandum of Law in support of their Motion for Summary Judgment or Partial Summary Judgment.

-1-

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ………………………………………………...iii-iv

FACTUAL ASSERTIONS……………………………………………….. 2

PROCEDURAL HISTORY………………………………………………… 3

MEMORANDUM OF LAW………………………………………………... 4

I.    UNDER THE SUMMARY JUDGMENT STANDARD THE
      DEFENDANTS ARE ENTITLED TO JUDGMENT IN THEIR
      FAVOR ……………………………………………..……..……………. 4

II.   THE COUNTY OF LOS ANGELES IS ENTITLED TO SUMMARY
      JUDGMENT AS THE FEE ASSESSED FOR THE RETURN OF
      THE SEIZED FIREARMS WAS NOT UNREASONABLE UNDER
      THE FOURTH AMENDMENT…………………………………………. 5

III.  DEPUTIES ROTH AND WALDRON ARE ENTITLED TO
      QUALIFIED IMMUNITY FOR THE PLAINTIFF'S CLAIM FOR
      PROPERTY DAMAGE UNDER THE FOURTH AMENDMENT………………20

A.    THERE IS NO EVIDENCE OF A FOURTH AMENDMENT
      VIOLATION COMMITTED BY THESE DEFENDANTS………………...........22

B.    THERE IS NO EVIDENCE THAT ROTH OR WALDRON VIOLATED
      THE CLEARLY ESTABLISHED LAW………………………………………..26

IV.   PLAINTIFF WILL PROVIDE NO EVIDENCE TO PROVE HER
      CLAIM FOR NEGLIGENCE AGAINST THE DEFENDANTS ….…………… 31

A.    PLAINTIFF DOES NOT ALLEGE DIRECT LIABLITY OF THE
      COUNTY OF LOS ANGELES..………………………………………… 32

B.    PLAINTIFF CANNOT PROVE NEGLIGENCE OF DEPUTIES
      ROTH OR WALDRON…………………………………………………….. 33

V.    THE PLAINTIFF CANNOT PREVAIL ON HER CAUSE OF
      ACTION FOR BREACH OF A BAILMENT CONTRACT……………………. 37

VI.   THE PLAINTIFF CANNOT PROVE HER CLAIM FOR TRESPASS
      TO CHATTELS AGAINST THE DEFENDANTS…..…………………… 40

VII.  THE PLAINTIFF IS NOT ENTITLED TO DECLARATORY
      RELIEF…………………………………………………………… 42

VIII.  THE PLAINTIFF CANNOT RECOVER PUNTIVE DAMAGES
      FROM THE COUNTY OF LOS ANGELES………………………………….. 42

CONCLUSION……………………………………………………………43

1

## **TABLE OF AUTHORITIES**

2

**CASES**                                                                      **Page(s)**

3

Aetna Life Ins. Co. of Hartford, Conn. v. Haworth, 300 U.S. 227, 240, (1937) …………42

4

American States Ins. Co. v. Kearns, 15 F.3d 142, 143–144 (9th Cir.1994) ………………42

5

6

Anderson v. Creighton, 483 U.S. 635, 640 (1987)……………………………………21, 26

7

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)………………………………………… 4

8

City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 271 (1981) …………………………42

9

Clarke v. Hoek, (1985) 174 Cal. App. 3d 208, 214…………………………………………… 32

10

11

Dalia v. United States, 441 U.S. 238, 258 (1979)…………………………………………27

12

Eastburn v. Reg'l Fire Prot. Auth., 31 Cal. 4th 1175, 1179–80 (2003)……………………32

13

Goudy & Stevens, Inc. v. Cable Marine, Inc., 924 F.2d 16, 18 (1st Cir.1991)……………38

14

Hope v. Pelzer, 536 U.S. 730, 741, (2002)…………………………………………………….. 27

15

16

Hunter v. Bryant, 502 U.S. 224, 227 (1991)……………………………………………....21

17

In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010)………………………… 4

18

Intel Corp. v. Hamidi, 30 Cal.4th 1342, 1350 (Cal. 2003)………………………………… 40

19

Jamgotchian v. Slender, 170 Cal.App.4th 1384, 1400-01 (2009)…………………………..41

20

Kam-Almaz v. United States, 682 F.3d 1364, 1368 (Fed. Cir. 2012) …………………38-39

21

22

Kirkpatrick v. City of Washoe, 792 F.3d 1184, 1193 (9th Cir. 2015)……………………... 20

23

Kwong v Bloomberg, 723 F.3d 160, 165 (2nd Cir. 2013)………………………………… 7

24

Lavan v. City of Los Angeles, 797 F. Supp. 2d 1005, 1013 (C.D. Cal. 2011) ………………………………………………………… 6

25

26

Lionberger v. United States, 371 F.2d 831, 840 (Ct.Cl.1967)……………………………… 38

27

Liston v. County of Riverside, 120 F.3d 965, 979 (9TH Cir .1997)………………………… 27

28

Llamera v. United States, 15 Cl.Ct. 593, 597 (1988)…………………………………….. 39

Mena v. City of Simi Valley, 226 F.3d 1031, 1041 (9th Cir.2000)……………………… 27

Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)……………………………………………… 21

Nally v. Grace Community Church (1988) 47 Cal.3d 278, 29………………………….32

Pearson v. Callahan, (2009) 555 U.S. 223, 232……………………………………… 20

Samson v. California, 547 U.S. 843, 855 n. 4 (2006)……………………………………… 22

Shafer v City of Santa Barbara, 868 F.3d 1110, 1118 (9th Cir. 2017)…………………..20

Soldal v. Cook County, 506 U.S. 56, 61 (1992 …………………………………...5, 22

Tarpley v. Greene, 684 F.2d 1 (D.C.Cir.1982)……………………………………………… 27

Thrifty-Tel, Inc. v. Bezenek, 46 Cal. App. 4th 1559, 1566 (1996)……………………… 40

Tolan v. Cotton, 572 U.S. 650, 656, (2014)………………………………………… 27

United States v. Jacobsen, 466 U.S. 109, 113, (1984) ………………………………5, 22

United States v. Knights, 534 U.S. 112, 118, (2001)…………………………………...22

United States v. Kriesel, 508 F.3d 941, 947 (9th Cir.2007)…………………………..22

U.S. v. Ramirez, 523 U.S. 65, 71 (1998)…………………………………………… 27

Wilson v Lynch, 835 F.3d 1083, 1097 (9th Cir. 2016) ……………………………….. 7

Zelig v. County of Los Angeles (2002) 27 Cal.4th 1112, 1127…………………………32

**STATUTES**

28 U.S.C. § 2201(a) ………………………………………………………………… 42
Cal. Penal Code § 33880 (a) ……………………………………………………… 6-7
Civil Code 1714…………………………………………………………………… 33
Fed. R. Civ. P. 56(a) ………………………………………………………………  4
Fed. Rules iv, Proc. 56(c) ……………………………………………….................  4
Gov. Code, § 815, subd. (a) …………………………………………………….. 32
Gov. Code § 818………………………………………………………………….. 43

### **FACTUAL ASSERTIONS**

The Plaintiff, Ana Fernandez sues the County of Los Angeles, Deputy John Roth and Wyatt Waldron for an alleged violation of the Federal Civil Rights Act (42 U.S.C. Section 1983). Specifically, the Plaintiff alleges that the County of Los Angeles violated the Plaintiff's Fourth Amendment rights by imposing an unreasonable fee for the return of firearms seized by the Los Angeles County Sheriff's Department, pursuant to California Penal Code section 33880(a). Plaintiff also alleges that the deputies Roth and Waldron violated the Plaintiff's Fourth Amendment by damaging property seized by the Los Angeles County Sheriff's Department. In addition, the Plaintiff's First Amended Complaint (FAC) alleges state law claims against the defendants for: negligence, breach of a bailment, trespass to chattels, declaratory relief and punitive damages.

In June 2018, the Los Angeles County Sheriff's Department (LASD) executed three (3) warrants for the seizure of firearms from the Plaintiff's husband, Manuel Fernandez, who was a person prohibited from owning firearms under California law. On the date of the initial search, the deputies were expecting to recover the 42 firearms registered to Mr. Fernandez, however, when they arrived at the location, they discovered more than 400 firearms and firearm related items. As a result of the three searches, the LASD seized 517 items of evidence, the overwhelming majority being firearms and firearm components.

Manuel Fernandez passed away before the criminal charges against him resolved. After his death, the court ruled that Plaintiff Ana Fernandez was entitled to recover the seized items. The LASD assessed Ana Fernandez a fee under California Penal Code section 33880 (a), of $54 per firearm for the return of the seized firearms. Ms. Fernandez claims that the fee was unreasonable under the Fourth Amendment, and that Deputies Roth and Waldron are liable for damaging the firearms at the time of the seizure.

## PROCEDURAL HISTORY

The Plaintiff filed her First Amended Complaint on October 12, 2021, alleging causes of action against the County of Los Angeles and several individual deputies and employees including Sheriff's Deputies Wyatt Waldron and John Roth. The County of Los Angeles and each of the individual employees filed a motions to dismiss the FAC. On September 28, 2022, the court issued a ruling granting and denying the Motions to Dismiss, in part. The Court permitted the Plaintiff leave to file a SAC. The Plaintiff opted not to file an SAC. [Docket No. 54]. The defendants answered the FAC.

Pursuant to the Court's order of September 28, 2022, the following claims survived the Motion to Dismiss this action: 1) Plaintiff's claim against the County of Los Angeles for violating the Fourth Amendment by imposing a fee before releasing the firearms to a rightful, non-indicted owner; 2) Plaintiff's claims against Defendants Roth and Waldron for violating the Fourth Amendment by damaging her property

-3-

during the initial seizures; 3) state law claims against the County and Defendants Roth and Waldron; and 4) Plaintiff's request for declaratory relief, inasmuch as it derives from her remaining claims. [Docket No. 53].

**MEMORANDUM OF LAW**

**I.   UNDER THE SUMMARY JUDGMENT STANDARD THE DEFENDANTS ARE ENTITLED TO JUDGMENT IN THEIR FAVOR**

At the summary judgment stage, facts must be viewed in light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. *Fed. Rules iv, Proc.* 56(c). Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying the portions of the pleadings and record that it believes demonstrate the absence of an issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof at trial, the moving party need not produce evidence negating or disproving every essential element of the non-moving party's case. Id. at 325. Instead, the moving party need only prove there is an absence of evidence to support the non-moving party's case. Id.; *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). The non-moving party has the burden of identifying with reasonable particularity the evidence that precludes summary judgment. Id. If the non-moving party fails to make this showing, then "[t]he moving party is entitled to a judgment as a matter of law." *Celotex*, 477 U.S. at 323.

In this case, the defendants are entitled to summary Judgment. The Plaintiff will offer no evidence to prove that the firearm fee assessed by the County of Los Angeles was unreasonable under the Fourth Amendment. Deputies Roth and Waldron are entitled to qualified immunity as their conduct was reasonable under the Fourth Amendment, and there is no evidence to prove that they violated any clearly established law. The Plaintiff can offer no evidence of a legal duty of care owed to her by the County of Los Angeles to support a claim for negligence, nor can she prove that deputies Roth or Waldron breached a duty of care and were the proximate cause of her alleged damages. The Plaintiff will offer no evidence to prove that a bailment existed between her and the defendants. The Plaintiff will offer no evidence that the defendants are liable for trespass to chattels. Because the Plaintiffs' claims fail, she is not entitled to declaratory relief. Finally, the Plaintiff cannot recover punitive damages from the County of Los Angeles, a public entity.

## II.   THE COUNTY OF LOS ANGELES IS ENTITLED TO SUMMARY JUDGMENT AS THE FEE ASSESSED FOR THE RETURN OF THE SEIZED FIREARMS WAS NOT UNREASONABLE UNDER THE FOURTH AMENDMENT

The Fourth Amendment prohibits only those searches and seizures that are "unreasonable." U.S. Const. amend. IV. A seizure of property occurs when there is "some meaningful interference with an individual's possessory interests in that property." *Soldal v. Cook County,* 506 U.S. 56, 61 (1992) (quoting *United States v.*

*Jacobsen,* 466 U.S. 109, 113, (1984)). A reasonable seizure of property does not violate the Fourth Amendment. To assess reasonableness, courts "must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Id.* at 125. *Lavan v. City of Los Angeles*, 797 F. Supp. 2d 1005, 1013 (C.D. Cal. 2011)

Here, the Plaintiff alleges that the firearm fee assessed by the County of Los Angeles pursuant to Cal. Penal Code § 33880 (a) violated the Constitution because it was unlawful under California law and therefore unreasonable under the Fourth Amendment. However, the uncontroverted facts show that firearm fee assessed by the County of Los Angeles pursuant to Cal. Penal Code § 33880 (a) was reasonable under the Fourth Amendment.

California Penal Code § 33880 is entitled, "Seizure, impounding, storage, or release of firearm, ammunition feeding device, or ammunition; imposition of charge to recover administrative costs; waiver; post storage hearing or appeal," provides, in pertinent part:

> "(a) City, county or city and county, or a state agency may adopt a regulation, ordinance, or resolution imposing a charge equal to its administrative costs relating to the seizure, impounding, storage, or release of any firearm, ammunition feeding device, or ammunition.
> (b) The fee under subdivision (a) shall not exceed the actual costs incurred for the expenses directly related to the taking possession of any firearm, ammunition feeding device, or ammunition, storing it, and surrendering possession of it to a licensed firearms dealer to be delivered to the owner."

The purpose of the statute, according to Senate Bill 746, is to "prescribe a procedure for a court or law enforcement agency in possession of a seized firearm to return the firearm to its lawful owner, as specified." *Weapons-Surrender-Criminal History Record Information (Stats.2018, c. 780 (S.B.746), § 22, eff. Jan. 1, 2019, operative July 1, 2020).* The costs assessed pursuant to this statute are remedial in nature. The administrative fee is assessed for the purpose of preventing the government from bearing the costs relating to the seizure, impounding, storage or release of firearms, ammunition feeding devices, and/or ammunition. Cal. Penal Code § 33880 (a). The fee can be imposed regardless of whether the person from whom the items were seized is convicted of a crime. The fees are not imposed as part of the imposition of a criminal sentence.

The government has a "long-recognized ability to impose fees relating to the exercise of constitutional rights when those fees are designed to defray the administrative costs of regulating protected activity." *Wilson v Lynch,* 835 F.3d 1083, 1097 (9th Cir. 2016) *citing, Kwong v Bloomberg, 723 F.3d 160, 165 (2nd Cir. 2013).*

The evidence in this case proves that the fee imposed upon the Plaintiff was imposed to defray the costs of seizure, impounding, storage, or release of firearms at issue.

### *Warrant to Seize the Firearms*

In June 2018, Los Angeles County Sheriff's Deputy Wyatt Waldron received a tip indicating that Manuel Fernandez was in possession of a large collection of

firearms. Waldron checked the Automated Firearms System (AFS) database and discovered that Manuel Fernandez had 42 firearms registered to him. [SUF, #2]. Waldron conducted an investigation for purposes of seizing the firearms. The investigation included researching Fernandez's criminal history; researching title to Fernandez's home; checking the DMV database for Fernandez's driver's license, then comparing that license to the AFS database to confirm that he was the correct person; reading historical court documents during Fernandez's 2009 conviction wherein Judge Carlos Chung admonished Manuel Fernandez that he was not to own or possess any firearms or dangerous weapons; conducting surveillance of Fernandez's residence with Deputy Livingston and Deputy Murray Jacob on June 11, 2018; preparing the warrant affidavit and statement of probable cause; and appearing at the courthouse to obtain the warrant. [SUF No. 3]. It took approximately fourteen (14) LASD manhours from sworn peace officer personnel to obtain the warrant for the first search and seizure of the Fernandez's residence at Caprock Lane. **Workhours = 14** [SUF No. 4]. In total, the Sheriff's Department participated in four (4) searches of Fernandez's residence or property associated with Manuel Fernandez. [SUF, No. 5]

### *Service of the First Warrant on the Caprock Residence (Caprock 1)*

On June 14, 2018, a team of thirteen (13) deputies served the search warrant on the Fernandez residence at 34710 Caprock Road in Agua Dulce, California. [SUF, No. 6]. The deputies were prepared to find the 42 firearms listed in the AFS

database as belonging to Manuel Fernandez. It quickly became clear to the deputies that Fenandez had hundreds of firearms. During the course of this first search, deputies recovered nearly 400 firearms from Fernandez's residence. [SUF No. 7].

Deputy Roth arrived at the scene of the Caprock Lane search on June 14, 2018, in his capacity as a detective who would be responsible for preparing the case to present to the criminal case. [SUF No. 8]. He observed the deputies making their way systematically through the piles of clothes, shoes, papers, clothes, knives and guns. Deputy Roth handled a couple of the firearms to clear them – make sure they were not loaded. Although not listed in the Incident report, Deputy Roth spent approximately 2 hours at the scene on June 14, 2018. **Workhours = 2** [SUF No. 9]

Sheriff's Department's protocol for a seizure of this magnitude is to have the Central Property and Evidence unit (CPE) in Whittier, CA arrive, take possession of the evidence and process it at the warehouse. [SUF No. 10]. However, when contacted by the Palmdale Station, CPE did not have the time or the manpower to retrieve the guns and process them on June 14, 2018, so the deputies and staff at Palmdale Station had to transport and process the weapons at the station. [SUF No. 11].

Because CPE would not be coming out to take possession of the firearms, Deputy Waldron came up with the best game plan that they could into start cataloging and processing the firearms at the scene. [SUF No. 12]. Deputy Waldron handled about 20-30 firearms passing them over to other deputies to write out the serial numbers, makes, models and other information. He also went through the

stacks of firearms in the garage recovering them and passing them to other deputies were delegated to identify the firearms and load them into the back seats of the patrol cars and the station-owned pick-up truck for transport to the Palmdale Station. [SUF No. 13].

Firearms were loaded into multiple black and white patrol vehicles and in the back of a pickup truck and driven in a convoy for the 15-20 minute drive from Caprock Lane directly to the Palmdale station. **Workhours = 3.25** [SUF No. 14].

The first Caprock Lane search began with the station briefing at 7:00 am and ended at 12:40 pm. The search took 5 hours and 40 minutes for each of the thirteen deputies involved. **Workhours = approx. 74**. [SUF No. 15].

Once at the station, approximately 20-25 deputies and detectives from the Palmdale Station took approximately four (4) to six (6) hours to unload and organize the firearms. **Workhours = 80-150**. [SUF No. 16].

Magnitude of the search and seizure at Caprock Lane on June 14, 2018 was greater than any seizure the deputies or staff had experienced. [SUF No. 17]. To seize that magnitude of firearms from a single source was a unique set of circumstances for the deputies. Prior to the Fernandez seizure, the second largest seizure Deputy Waldron experienced was 15 firearms. [SUF No. 18].

### *Service of the Warrant at the Sweetwater Address*

At the time of the first Caprock Lane search, deputies were informed that Manuel Fernandez's wife Ana Fernandez had recently taken some of Manuel

Fernandez's firearms to the home of his business partner, Carey Moisan, at 34965 Sweetwater in Agua Dulce, California. [SUF No. 19]. Because they had not recovered all of the original 42 firearms that we were originally seeking, Deputies Vilanova and Waldron swore out another warrant for a search of the Sweetwater address. **Workhours = unknown**. [SUF No. 20].

A team of ten deputies conducted a two-hour search of the Sweetwater address in the evening of June 14, 2018. **Work Hours = 20**.   [SUF No. 21].

Deputies recovered an additional 26 firearms and other evidence from that location. [SUF No. 22]. The firearms were loaded into the back seat of a cargo van and transported back to the Palmdale Station to be processed with the other firearms and evidence seized from Mr. Fernandez's residence at Caprock Lane. **Workhours = 2.50.** [SUF No. 23].

### *Second Seizure from Caprock Lane (Caprock 2)*

Based on information that Deputy Roth received indicating that Mr. Fernandez may have engaged in the illegal sale of firearms, Deputy Roth applied for the warrant for the second search of the Caprock Lane residence. [SUF No. 24]. It took Deputy Roth approximately three hours to prepare and obtain the warrant from the judge at the Antelope Valley Courthouse. **Workhours = 3**. [SUF No. 25].

Nine (9) deputies were involved in the second Caprock Lane search which occurred on or about June 20, 2018. [SUF No. 26]. In addition to electronic components, deputies seized nearly 100 additional firearms from locations that were

bombarded with layers of debris and were missed during the first search. [SUF No. 27]. The evidence was transported to the Palmdale Station to be booked with the other evidence seized from Caprock 1 and the Sweetwater seizures. [SUF No. 28]. The nine-person search team took four (4) hours to conduct the second search art Caprock Lane and to seize the additional evidence. **Workhours = 36**. [SUF No. 29].

### ***Processing the Seized Firearms for Storage at Palmdale Station***

In total, the Sheriff's Department seized 517 items of evidence from locations associated with Manuel Fernandez, 493 were firearms, ammunition or firearm parts. [SUF No. 30]. At the Palmdale Station, the firearms were moved a few at a time from the patio and taken into the evidence room to start the process of booking them into evidence. [SUF No. 31].

Processing each firearms entailed the following: Clearing the weapon to make sure that there are no live rounds in the chamber, and no magazines with ammunition inside the weapon. After the weapon was cleared the process of entering information into the various databases began. First, the deputies completed the "Firearm Entry Forms" with the data necessary for entry into the Sheriff's Department's computer system known as PRELIMS (Property Evidence and Lab Information System), which is also the Sheriff's Department's chain-of-custody system for evidence. [SUF No. 32].

The deputies were required to measure each firearm. The database requires that the size, model, make, manufacturer and serial number of each firearm be entered.

[SUF No. 33].

Approximately 100 of the Fernandez firearms came from other countries and contained writing in Arabic, German, Spanish and various other languages that the staff processing the firearms could not understand. Several of these foreign weapons did not have traditional serial numbers, which is a required entry for the Department of Justice's database. For each of these "problem" weapons, the evidence custodian spent hours researching the weapons online by their physical characteristics. For those that were still unidentifiable, the evidence custodian contacted personnel at the Sheriff's Department's Crime Lab and the Department of Justice (DOJ) to assist with the identifying the weapon and/locating identifiable serial numbers. [SUF No. 34].

After the PRELIMS entry was complete, a barcode was assigned to each item of evidence. From there, an evidence label with the barcode was generated and affixed to the particular item of evidence separately. [SUF No. 35].

The process of entering the information into the PRELIMS system was done by the property custodian with the assistance of the following deputy personnel: Deputy Richard Leon (June 14, 18 and August 16, 2018); Kyle Dingman (June 14, 2018); Deputy Nicholas Saylor (June 15, 2018); Deputy Murray Jacob (June 18 and July 11, 2018); Deputy David Roach (June 19, 2018); Deputy Salvador Moreno (June 22, 2018); Deputy Jason Ames (June 22, and 25, 2018); Deputy John Roth (June 28, 2018); Deputy Joshua Nemeth (June 15 and 18, 2018); Deputy Kevin Bowes (June 15 and 16, 2018). On each of these days, the deputies worked their

entire 8 hour shifts processing the weapons. **Workhours = 128.** [SUF No. 34].

The property custodian then reviewed each PRELIMS entry made by deputy personnel and corrected the inaccurate or incorrect entries made. [SUF No. 37]. After the information was entered into PRELIMS, the station personnel then had to enter the information into the AFS (Automated Firearm System) computer system which is a computer system maintained by the Department of Justice (DOJ). [SUF No. 38].

After the information was entered into the AFS system, a printout was generated with data regarding each firearm. The printout informs the Department and all law enforcement agencies across the country whether the firearm had been reported as having been used in a crime, was stolen, or was otherwise unlawful. [SUF No. 39]. A hard copy of each AFS return computer return was then affixed to each "Firearm Entry Form" in order to confirm that each firearm had been verified through AFS. [SUF No. 40].

Six staff (6) members at the Palmdale station took approximately 10 minutes per firearm to enter the Fernandez firearms into the AFS database. **Workhours = approx. 82.** [SUF No. 41].

In addition to the work done by the deputies to enter the Fernandez firearms into PRELIMS, and the work done by the station personnel to enter the Fernandez firearms into AFS, evidence custodian Susan Brown spent approximately 6 weeks clearing, entering, researching, correcting computer entries, reviewing crime returns and storing the Fernandez weapons. Beginning June 14, 2018, at the start of each 8

hour shift, she spent approximately 1-2 hours per day on my other duties and 6 hours per day processing the Fernandez firearms before their release to the CPE warehouse on July 25, 2018. **Workhours = 180**. [SUF No. 42].

### *Transfer of the Firearms to the Central Property Warehouse*

On July 25, 2018, four Evidence and Property Custodians from CPE made the two-hour drive, each way, between Whittier to the Palmdale Station in two box trucks to retrieve the evidence and bring it back to the CPE warehouse for processing and storage. **Workhours = 16**. [SUF No. 43]. CPE custodians made two additional trips to the Palmdale Station to retrieve property from this seizure on August 16 and August 18, 2018.   **Workhours = approx. 32**. [SUF No. 44].

In order to recover and transport weapons from a station, CPE custodians are required to have to weapons specialists trained in the handling of firearms, accompany them to the station and take control of the transport. Such specialists are not required for the handling of non-lethal property. [SUF No. 45].

The verification process required staff to reviewing the size, model, make and serial number serial numbers and other identifying information entered by Palmdale into the Automated Firearm System ("AFS"), comparing that information against the actual weapon, then reviewing AFS returns to verify than none of the weapons were stolen. [SUF No. 46].

The custodians at CPE processed nearly 1,000 pieces of evidence including nearly 500 firearms, computers, and ammunition as follows: Each item was counted.

The weapons were cleared of ammunition and magazines. Even if cleared before, for safety reasons, each time a weapon is handled, it must be cleared of all ammunition and magazines. Bar codes which had been placed on the evidence at Palmdale were scanned one-by-one into the computer system where labels were generated. The handguns were placed into individual envelopes with the matching label secured to the envelope and sealed. The long guns were affixed with matching labels and placed into wheeled bins. As each banker's box was full of handgun envelopes, and as each wheeled bin had a sufficient number of long guns, the guns were placed into the firearm vault – a locked vault within the secured property warehouse. [SUF No. 47].

The movement of each weapons was entered into the PRELIMS computer system. The identifying information for each firearm was also entered by CPE staff into JDIC (Justice Data Interface Controller) which is the computer system used by the Sheriff's Department to interface with other local and national law enforcement agencies. [SUF No. 48].

The CPE staff processed (placed data into the PRELIMS) at a rate of about 7 items of evidence per hour (517 items total). **Workhours = approx. 74.** [SUF No. 49].

On December 11, 2019, CPE received a request to transport the firearms back to the Palmdale Station for release. CPE Staff made the entries into PRELIMS to reflect the change in the chain of custody of each item back to the Palmdale Station.

Approximately 3-5 staff members were involved in the processing, data entry, and storage of the evidence from the involved seizure. CPE did not calculate the number of hours spent by all staff who were involved in this endeavor, however there were many overtime hours incurred to assist with this volume of firearms. **Workhours = unknown.** [SUF No. 50].

In December 2019 approximately 4-6 CPE staff members were involved in transferring the evidence back to the Palmdale Station for its release. **Workhours = 16-20** [SUF No. 51].

### ***Transfer of Handguns to NIBIN for Ballistics Testing***

The LASD's Firearms Identification Section is a participant in the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) National Integrated Ballistic Information Network (NIBIN). NIBIN maintains a database of fired cartridge case images. The purpose of the system is to discover whether the firearms tested have similar markings on the fired cartridge cases to those evidence cartridge case images in the database. This will assist in determining whether a firearm has been used in a crime or if two fired cartridge cases from different crime scenes were fired from the same firearm. The database is an instrumental tool in assisting to solve firearm related crimes throughout the country. [SUF No. 52].

A total of 98 of the firearms seized from Fernandez were transferred from the Central Property Unit to LASD Scientific Services for ballistics testing. [SUF No. 53]. At the time of the testing of these weapons, it took Deputy John Carter between

30 minutes to one hour per firearm, totaling between 48 and 97 hours to complete the ballistics testing of the firearms from the Fernandez seizure. **Workhours 48-97**. [SUF No. 55].

### ***Transfer of Evidence Back to Palmdale Station for Release***

In 2019, the LASD received notice that the Fernandez firearms were to be returned to Ms. Ana Fernandez via an agent with a Federal Firearms License. Thus, the process of entering the firearms in PRELIMS and AFS had to be reversed, to reflect the change in custody status. [SUF No. 56].

The staff at the Palmdale Sheriff's Station confirmed the credentials of Carol Watson, the agent designated by Ms. Fernandez to retrieve the firearms. The firearms were delivered back to from the CPE warehouse on December 18, 2019, and unloaded. **Manhours = unknown**. [SUF No. 57].

The property custodian and station staff began the process of updating the PRELIMS entries on December 18, 1019, to release the firearms. The release process continued on December 19, 2019, when the LASD released a total of 451 firearms to Ana Fernandez's agent. [SUF No. 58]. Due to the sheer volume of firearms, it took an entire 8-hour shift for the property custodian and staff to enter the change of custody into PRELIMS, verify each firearm, and prepare the receipts. **Workhours = 16**. [SUF No. 59].

After the firearms were released on December 19, 2019, the staff at the Palmdale station personnel spent another two weeks updating the AFS system to

inform the DOJ and all law enforcement agencies that the Fernandez firearms had been released from Sheriff's Department custody. **Workhours = unknown**. [SUF No. 60].

The employees involved with the seizure, storage, impounding, and release of the Fernandez firearms earned between $28.25 per hour (civilian) and $81.05 per hour (sworn/deputy) in June 2018 and December 2019 with sworn (deputy personnel earning higher hourly rates. [SUF No. 61].

The Sheriff's Department assessed the Plaintiff a firearm fee of $54 per firearm for the 451 firearms returned to Ms. Fernandez for a total sum of $24,354.00. That fee was reasonable in this case.

The Sheriff's Department expended at a minimum, 826.75 and as many as 949.75 employee workhours in connection with the seizure, impounding, storage and release of the Fernandez firearms based on the number of workhours that could be calculated. The Department actually expended more time than documented in this motion as the number of the hours could not be calculated.

In June 2018, the lowest hourly pay for a Department employee who worked on the Fernandez firearms was $28.25 per hour. The highest hourly pay was $81.05 per hour. Averaging the highest and lowest hourly wage brings the average hourly pay to $54.65 per hour. For the minimum number of hours expended on the Fernandez firearms (826.75), Ms. Fernandez could have been reasonably assessed $ 45,181.88 under the Penal Code.   For the maximum known hours expended

-19-

(949.75), Ms. Fernandez could have been reasonably assessed $51,903.00. Certainly, the cost to the County was greater as some of the work could not be quantified.

The Plaintiff will offer no evidence that the fee of $24,354.00 was unlawful under the California Penal Code or unreasonable under the Fourth Amendment as the amount actually expended by the Department vastly exceeded the amount assessed.

## III.   DEPUTIES ROTH AND WALDRON ARE ENTITLED TO QUALIFIED IMMUNITY FOR THE PLAINTIFF'S CLAIM FOR PROPERTY DAMAGE UNDER THE FOURTH AMENDMENT

Qualified immunity shields federal and state officials from money damages unless the Plaintiff pleads facts showing (1) that the official violated a constitutional right, and (2) that the right was "clearly established" at the time of the challenged conduct." _Kirkpatrick v. City of Washoe_, 792 F.3d 1184, 1193 (9th Cir. 2015). The Plaintiff "bears the burden of showing that the rights alleged were clearly established." _Shafer v City of Santa Barbara_, 868 F.3d 1110, 1118 (9th Cir. 2017).

The Supreme Court has mandated a two-step process resolving government officials' qualified immunity claims. The court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right, and the court must decide whether the right at issue was "clearly established" at the time of defendant's alleged misconduct. Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right. _Pearson v._

-20-

*Callahan,* (2009) 555 U.S. 223, 232. The court has the discretion to determine the sequence in which these two steps are analyzed. *Id.* at p. 236.

"Clearly established" for qualified immunity purposes means that the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. His very action need not previously have been held unlawful, but in the light of per-existing law its unlawfulness must be apparent. *Anderson v. Creighton,* 483 U.S. 635, 640 (1987). "Because qualified immunity is 'an immunity from suit rather than a mere defense to liability ... it is effectively lost if a case is erroneously permitted to go to trial.'" *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985). "Indeed, we have made clear that the 'driving force' behind creation of the qualified immunity doctrine was a desire to ensure that 'insubstantial claims' against government officials [will] be resolved prior to discovery." *Anderson,* at p. 640, n.2. "Accordingly, 'we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation.'" *Hunter v. Bryant,* 502 U.S. 224, 227 (1991).

In this case, Deputies Roth and Waldron are entitled to qualified immunity because they did not engage in unreasonable conduct in violation of the Fourt Amendment. However, if it is found that their conduct violated the Fourth Amendment, they are still entitled to qualified immunity as their conduct did not violate any clearly established law of which a reasonable office should have known.

## A.   THERE IS NO EVIDENCE OF A FOURTH AMENDMENT VIOLATION COMMITTED BY THESE DEFENDANTS.

The Fourth Amendment prohibits only those searches and seizures that are "unreasonable." U.S. Const. amend. IV. A seizure of property occurs when there is "some meaningful interference with an individual's possessory interests in that property." *Soldal v. Cook County,* 506 U.S. 56, 61 (1992) (quoting *United States v. Jacobsen,* 466 U.S. 109, 113, (1984)). A reasonable seizure of property does not violate the Fourth Amendment. To assess reasonableness, courts "must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Id.* at 125.

In determining whether such a seizure comports with the Fourth Amendment, "the touchstone ... is reasonableness." *United States v. Kriesel,* 508 F.3d 941, 947 (9th Cir.2007) (quoting *Samson v. California,* 547 U.S. 843, 855 n. 4 (2006)). The "general Fourth Amendment approach" requires courts to examine the totality of the circumstances to determine whether a search or seizure is reasonable. *United States v. Knights,* 534 U.S. 112, 118, (2001) (citation omitted).

In this case, the Plaintiff alleges that the deputies violated the Fourth Amendment by damaging the firearms at the time of the initial seizures. The Plaintiff will offer no such evidence of a violation.

--

During the first Caprock Lane search on June 14, 2018, the deputies were prepared to find the 42 firearms listed in the AFS database as belonging to Manuel Fernandez. It quickly became clear to the deputies that Fenandez had hundreds of firearms. During the course of this first search, deputies recovered nearly 400 firearms from Fernandez's residence. [SUF, No. 7]. There were waist-high piles of boxes, shoes, scopes, clothing, papers, collectors' items, knives and guns (concealed and unconcealed) in every crevice, corner and compartment. The firearms were haphazardly stored, thrown about in different piles, and buried under piles and layers of debris, household items. As the deputies removed layers of debris, they uncovered more and more firearms. [SUF, No. 78]. Deputy Waldron pulled firearms from the debris, cleared them and passed the, off to other deputies to load them for transport. [SUF, No. 82].

Sheriff's Department's protocol for a seizure of this magnitude is to have the Central Property and Evidence unit (CPE) in Whittier, CA arrive, take possession of the evidence and process it at the warehouse. [SUF No. 10]. When contacted by the Palmdale Station, CPE did not have the time or the manpower to retrieve the guns and process them on June 14, 2018, so the deputies and staff at Palmdale Station had to transport and process the weapons at the station. [SUF, No. 11]. Because CPE would not be coming out to take possession of the firearms, Deputy Waldron came up with the best game plan that they could - to start cataloging and processing the firearms at the scene [SUF, No. 12]. Deputy Waldron handled about 20-30 firearms

passing them over to other deputies to write out the serial numbers, makes, models and other information. He also went through the stacks of firearms in the garage recovering them and passing them to other deputies were delegated to identify the firearms and load them into the back seats of the patrol cars and the station-owned pick-up truck for transport to the Palmdale Station. [SUF, No.13]

During the seizures, Deputy Waldron handled the Fernandez firearms in the same way as any other property. The firearms were cleared to make sure they were loaded and walked to the person to load them. For handguns, a zip tie was placed through the magazine well and the slide and then the handgun was placed in an envelope. The firearm was stored in a trunk for transport back to the station. [SUF, No. 84]. Because of the volume of long guns, they had to be transported in a truck and in a convoy of patrol cars. It took two hours to load the firearms into the truck and vehicles. The firearms were transported to the station in a convoy with patrol cars behind the tuck to ensure nothing would happen to them. [SUF, No. 85].

During the second Caprock Lane search, deputies seized nearly 100 additional firearms from locations which were so bombarded with layers of debris that they were missed during the first search. [SUF, No. 87]. Every item that Deputy Roth handled was handled with care and due regard for the property seized. [SUF, No. 88]. In order to transport the firearms Deputy Roth placed the handguns into manilla envelopes, then into a receptacle to prevent them from sliding or moving around. Long guns were laid down with towels, blankets or cardboard placed between them

to prevent damage. [SUF, No. 89]. At Palmdale station, the firearms were carefully removed from the patrol cars and the pick-up truck, then carefully laid out on the station outside covered patio which was the only location large enough to encompass all of the evidence. Each weapon was placed on the ground and facing in a direction were one could observe that there was no live ammunition round in the chamber. The firearms were arranged by category and photographed. The firearms were all uniform, all even and were set down with care. [SUF, 90].

The magnitude of the search and seizure at Caprock Lane on June 14, 2018 was greater than any seizure the deputies or staff had experienced. [SUF, No. 4]. To seize that magnitude of firearms from a single source was a unique set of circumstances for the deputies. The second largest firearm seizure conducted by Deputy Waldron was for 15 firearms. The greatest number of firearms that the Central Property custodian has seen was approx. 100 firearms received during a gun buyback program. [SUF, No. 15]

Plaintiff, Ana Fernandez will offer no evidence of the condition of the firearms prior to the June 2018, and is unaware of whether her husband's collection of firearms was new or used. [SUF, No. 72, 73]. The Plaintiff cannot identify which, if any, of the seized firearms were allegedly damaged by the sheriff's department. [SUF, No. 74].

Based on these facts, there is no evidence that the Deputies Roth or Waldron were unreasonable in their seizure of the Fernandez firearms, nor that their actions

caused damage to the firearms. Under the totality of the circumstances, the deputies were faced with a highly unusual seizure where they recovered 10 times the number of firearms that they were seeking. The deputies followed the protocols and requested CPE custodians to retrieve the evidence. When that option was not available, the deputies loaded the firearms into the pickup truck and a convoy of radio cars and transported them to the station as best they could.

There is no evidence that Deputies Roth or Waldron's conduct was unreasonable under the unique circumstances they faced, nor that they damaged any firearms in the process.

Because there is no Fourth Amendment violation, the deputies are entitled to qualified immunity, and summary judgment on this claim.

## B.   THERE IS NO EVIDENCE THAT ROTH OR WALDRON VIOLATED THE CLEARLY ESTABLISHED LAW.

Even if the deputies had violated the Fourth Amendment, they are still entitled to qualified immunity.

Whether a law enforcement official entitled to the protection of qualified immunity may be held personally liable for the alleged unlawful action will depend on the "objective legal reasonableness" of the action, which must be assessed in light of the laws or "legal rules" that were "clearly established" at the time the action occurred. _Anderson_, 483 U.S. at 639–40. The Court specifically held that "[t]he contours of the right must be sufficiently clear that a reasonable official

-26-

would understand that what he is doing violates that right." _Id._ A defendant violates an individual's clearly established rights only when "'the state of the law' at the time of an incident provided 'fair warning'" to the defendant that his or her conduct was unconstitutional. _Tolan v. Cotton_, 572 U.S. 650, 656, (2014) (quoting _Hope v. Pelzer_, 536 U.S. 730, 741, (2002))

The Fourth Amendment "right" of which this the Plaintiff complains is the alleged damage to the firearms at the time of the seizure. "[O]fficers executing search warrants on occasion must damage property in order to perform their duty." _Dalia v. United States,_ 441 U.S. 238, 258 (1979). "Destruction of property that is not reasonably necessary to effectively execute a search warrant may violate the Fourth Amendment." _Tarpley v. Greene,_ 684 F.2d 1 (D.C.Cir.1982). Rather, only unnecessarily destructive behavior, beyond that necessary to execute a warrant effectively, violates the Fourth Amendment. _Mena v. City of Simi Valley,_ 226 F.3d 1031, 1041 (9th Cir.2000) ("officers executing a search warrant occasionally must damage property in order to perform their duty."). "The general touchstone of reasonableness which governs Fourth Amendment analysis, ... governs the method of execution of [a search] warrant." _U.S. v. Ramirez,_ 523 U.S. 65, 71 (1998) ("[e]xcessive or unnecessary destruction of property in the course of a search may violate the Fourth Amendment, even though the entry itself is lawful."); _see Liston v. County of Riverside,_ 120 F.3d 965, 979 (9TH Cir .1997) ("only unnecessarily destructive behavior, beyond that necessary to execute a warrant effectively, violates

-27-

the Fourth Amendment"). Therefore, the touchstone of conduct during a search is "reasonableness."

The Plaintiff will offer no evidence that Deputy Roth or Deputy Waldron unreasonably destroyed her property at the time of the seizure.

Plaintiff Ana Fernandez has no knowledge of how many handguns or long guns were in her husband's possession in June 2018. [SUF, No. 63]. The Plaintiff will offer no evidence of the condition of the firearms prior to the June 2018, and is unaware of whether her husband's collection of firearms was new or used. [SUF, No. 72-73]. The Plaintiff cannot identify which, if any, of the seized firearms were allegedly damaged by the sheriff's department. [SUF, No. 74]. The Plaintiff has no knowledge of the value of seized firearms prior to the seizure. [SUF No. 68]. She has no receipts, no appraisals, and no evidence of insurance or insured value of the firearms prior to the seizure. [SUF Nos. 64-65].

The undisputed evidence shows that firearms owned by Mr. Fernandez were not in pristine condition at the time of the seizure. Manuel Fernandez would shoot the firearms in his possession, and they were not maintained as collectors' items. [SUF, No. 70]. Many of the firearms were kept in the garage without air conditioning in the Agua Dulce desert. [SUF No. 71]. While the Plaintiff has no knowledge of the condition of the firearms at the time of the seizure, the deputies do have such knowledge. Deputy Roth observed that the majority of the firearms were old, not well cared for, and simply strewn about on the property. [SUF, No. 76].

-28-

Deputy Waldron observed that most of the guns, especially the older wood grain stocks, all contained scratches or dings in them prior to their transport to the Palmdale Station. [SUF, No. 77]. The overwhelming majority of the long guns and rifles had damage (scratches/nicks) to the barrels and stocks, some of the stocks were split. Many of the guns were covered with packing grease and gauze. The property custodian often had to clear off debris or other things affixed to a firearm in order to find the serial number or other identifying information. [SUF, No. 75].

Prior to their seizure, the firearms were maintained at the Caprock Lane and Sweetwater residences in "hoarder-like conditions," as reflected by the pre-search video recordings attached as Exhibit 18 to this motion. During the first Caprock Lane search, deputies recovered nearly 400 firearms from Fernandez's residence. There were waist-high piles of boxes, shoes, scopes, clothing, papers, collectors' items, knives and guns (concealed and unconcealed) in every crevice, corner and compartment. The firearms were haphazardly stored, thrown about in different piles, and buried under piles and layers of debris, household items. As the deputies removed layers of debris, they uncovered more and more firearms. [SUF, No. 78]. Dozens of guns and gun parts were stored in the garage stacked inside of Rubbermaid trash cans. [SUF, No. 79]. Ninety percent of the firearms retrieved were not stored in a box, safe, or any other kind of protective case. [SUF, No. 80]. Outside of the garage were numerous inoperable vehicles, and the garage was packed from floor to ceiling with so many items that one could not park or even

-29-

traverse in the area. [SUF, No. 81]. Deputy Roth observed the deputies making their way systematically through the piles of clothes, shoes, papers, clothes, knives and guns. The deputies were pulling firearms from the layers of trash, rubbish and collectable items. [SUF, No. 83].

The Sweetwater location was also kept in "hoarder-like conditions" with weapons haphazardly stored and maintained. [SUF, No. 86]. The conditions and the storage of the firearms at Sweetwater were captured in the pre-search video footage attached as Exhibit 19 to this motion.

During the seizure at Caprock #1 and Sweetwater, Deputy Waldron handled the Fernandez firearms in the same way as any other property. The firearms were cleared to make sure they were loaded and walked to the person to load them. For handguns, a zip tie was placed through the magazine well and the slide and then the handgun was placed in an envelope. The firearm was stored in a trunk for transport back to the station. [SUF, No. 84]. Because of the volume of long guns, they had to be transported in a truck and inside a convoy of patrol cars. The firearms were transported to the station with patrol cars behind the tuck to ensure nothing would happen to the firearms. [SUF, No. 85].

During the second Caprock Lane search, deputy Roth and his team seized nearly 100 additional firearms from locations which were so bombarded with layers of debris that they were missed during the first search and handled the items with care. [SUF, No. 87, 88].

At Palmdale station, the firearms were carefully removed from the patrol cars and the pickup truck, then carefully laid out on the station outside covered patio which was the only location large enough to encompass all of the evidence. Each weapon was placed on the ground and facing in a direction were one could observe that there was no live ammunition round in the chamber. The firearms were arranged by category and photographed. The firearms were all uniform, all even and were set down with care. [SUF, No. 90]. The firearms were then moved a few at a time from the patio and taken into the evidence room to start the process of booking them into evidence. The evidence room at the station is a pretty small room, so the deputies stored the firearms as best they could with the secured space that they had. [SUF, No. 91]. For an unprecedented seizure of this magnitude adjustments were made to LASD's standard procedure based on the totality of the circumstances. [SUF, No. 92].

Based on the undisputed facts, the Plaintiff will offer no evidence that the firearms were unnecessarily damaged at the time of their seizure, and certainly no evidence that they were damaged by Deputy Roth or Deputy Waldron. As there is no evidence of a violation of clearly established law, Deputies Roth and Waldron are entitled to qualified immunity and summary judgment on the Fourth Amendment claim.

## IV.   PLAINTIFF WILL PROVIDE NO EVIDENCE TO PROVE HER CLAIM FOR NEGLIGENCE AGAINST THE DEFENDANTS

In order to prove facts sufficient to support a finding of negligence, a plaintiff must show that the defendant had a duty to use due care, that the defendant breached that duty, and that the breach was the proximate or legal cause of the resulting injury." _Nally v. Grace Community Church_ (1988) 47 Cal.3d 278, 292. The question of the existence of a legal duty of care in a given factual situation presents a question of law which is to be determined by the courts alone. _Clarke v. Hoek_, (1985) 174 Cal. App. 3d 208, 214.

### A.    PLAINTIFF DOES NOT ALLEGE DIRECT LIABILITY OF THE COUNTY OF LOS ANGELES.

A duty of care owed by a public entity such as the County of Los Angeles, must be set forth by statute. The California Tort Claims Act provides that "[a] public entity is not liable for an injury," "[e]xcept as otherwise provided by statute." (Gov. Code, § 815, subd. (a). As that language indicates, the intent of the Tort Claims Act is to confine potential governmental liability, not expand it. _Zelig v. County of Los Angeles_ (2002) 27 Cal.4th 1112, 1127. Direct tort liability of public entities must be based on a specific statute declaring them to be liable, or at least creating some specific duty of care, and not on the general tort provisions of Civil Code section 1714. _Eastburn v. Reg'l Fire Prot. Auth._, 31 Cal. 4th 1175, 1179–80 (2003). Otherwise, the general rule of immunity for public entities would be largely eroded by the routine application of general tort principles. _Id_, at p.31

The Plaintiff cannot prove her cause of action for negligence against the County of Los Angeles for two reasons: First, the Plaintiff identifies no statute imposes *direct* liability on the County of Los Angeles for charging the firearm fee at issue here. The FAC alleges that the County of Los Angeles is liable for negligence under Civil Code section 1714, however, the general tort provisions of section 1714 impose no liability on the County of Los Angeles, a public entity.

## B.    PLAINTIFF CANNOT PROVE NEGLIGENCE OF DEPUTIES ROTH OR WALDRON.

Second, to the extent that the Plaintiff hinges her negligence claim on a derivative liability theory for the conduct of Deputies Roth and Waldron, she cannot prove the elements of the claim. Assuming that the deputies owed Mrs. Fernandez a duty of care when they lawfully seized her husband's firearms, she can show no evidence of a breach of that duty, nor that the acts of Deputies Roth or Waldron caused her damages.

Plaintiff Ana Fernandez has no knowledge of how many handguns or long guns were in her husband's possession in June 2018. [SUF, No. 63]. The Plaintiff is unaware of the condition of the firearms prior to the June 2018. And is unaware of whether her husband's collection of firearms was new or used. [SUF, No. 72]. The Plaintiff has no documentation showing the condition of the firearms prior to June 2018. [SUF, No. 73]. The Plaintiff cannot identify which, if any, of the seized firearms were allegedly damaged by the sheriff's department. [SUF, No. 74]. The

Plaintiff has no knowledge of the value of the seized firearms prior to the seizure. [SUF No. 68]. She has no receipts, no appraisals, and no evidence of insurance or insured value of the firearms prior to the seizure. [SUF Nos. 64-].

The undisputed evidence shows that firearms owned by Mr. Fernandez were not in pristine condition at the time of the seizure. Manuel Fernandez would shoot the firearms in his possession, and they were not maintained as collectors' items. [SUF, No. 70]. Many of the firearms were kept in the garage without air conditioning in the Agua Dulce desert. [SUF No. 71]. While the Plaintiff has no knowledge of the condition of the firearms at the time of the seizure, the deputies do have such knowledge. Deputy Roth observed that the majority of the firearms were old, not well cared for, and simply strewn about on the property. [SUF, No. 76]. Deputy Waldron observed that most of the guns, especially the older wood grain stocks, all contained scratches or dings in them prior to their transport to the Palmdale Station. [SUF, No. 77]. The overwhelming majority of the long guns and rifles had damage (scratches/nicks) to the barrels and stocks, some of the stocks were split. Many of the guns were covered with packing grease and gauze. The property custodian often had to clear off debris or other things affixed to a firearm in order to find the serial number or other identifying information. [SUF, No. 75].

Prior to their seizure, the firearms were maintained at the Caprock Lane and Sweetwater residences in "hoarder-like conditions," as reflected by the pre-search video recordings attached as Exhibits 18 and 19 to this motion. During the first

Caprock Lane search, deputies recovered nearly 400 firearms from Fernandez's residence. There were waist-high piles of boxes, shoes, scopes, clothing, papers, collectors' items, knives and guns (concealed and unconcealed) in every crevice, corner and compartment. The firearms were haphazardly stored, thrown about in different piles, and buried under piles and layers of debris, household items. As the deputies removed layers of debris, they uncovered more and more firearms. [SUF, No. 78]. Dozens of guns and gun parts were stored in the garage stacked inside of Rubbermaid trash cans. [SUF, No. 79]. Ninety percent of the firearms retrieved were not stored in a box, safe, or any other kind of protective case. [SUF, No. 80]. Outside of the garage were numerous inoperable vehicles, and the garage was packed from floor to ceiling with so many items that one could not park or even traverse in the area. [SUF, No. 81]. Deputy Roth observed the deputies making their way systematically through the piles of clothes, shoes, papers, clothes, knives and guns. The deputies were pulling firearms from the layers of trash, rubbish and collectable items. [SUF, No. 83].

The Sweetwater location was also kept in "hoarder-like conditions" with weapons haphazardly stored and maintained. [SUF, No. 86]. The conditions and the storage of the firearms at Sweetwater were captured in the pre-search video footage attached as Exhibit 19 to this motion.

During the seizure at Caprock #1 and Sweetwater, Deputy Waldron handled the Fernandez firearms in the same way as any other property. The firearms were

cleared to make sure they were loaded and walked to the person to load them. For handguns, a zip tie was placed through the magazine well and the slide and then the handgun was placed in an envelope. The firearm was stored in a trunk for transport back to the station. [SUF, No. 84]. Because of the volume of long guns, they had to be transported in a truck and inside a convoy of patrol cars. It took two hours to load the firearms into the truck and vehicles. The firearms were transported to the station with patrol cars behind the tuck to ensure nothing would happen to the firearms. [SUF, No. 85].

During the second Caprock Lane search, deputy Roth and his team seized nearly 100 additional firearms from locations which were so bombarded with layers of debris that they were missed during the first search. [SUF, No. 87]. Every item that Deputy Roth handled was handled with care and due regard for the property seized. [SUF No. 88]. In order to transport the firearms Deputy Roth placed the handguns into manilla envelopes, then into a receptacle to prevent them from sliding or moving around. Long guns were laid down with towels, blankets or cardboard placed between them to prevent damage. [SUF, No. 89].

At Palmdale station, the firearms were carefully removed from the patrol cars and the pick-up truck, then carefully laid out on the station outside covered patio which was the only location large enough to encompass all of the evidence. Each weapon was placed on the ground and facing in a direction were one could observe that there was no live ammunition round in the chamber. The firearms were

arranged by category and photographed. The firearms were all uniform, all even and were set down with care. [SUF, No. 90]. The firearms were then moved a few at a time from the patio and taken into the evidence room to start the process of booking them into evidence. The evidence room at the station is a pretty small room, so the deputies stored the firearms as best they could with the secured space that they had. [SUF, No. 91]. For an unprecedented seizure of this magnitude adjustments were made to LASD's standard procedure based on the totality of the circumstances. [SUF, No. 92]

Based on the undisputed facts, the Plaintiff has no evidence to prove that Deputy Roth or Deputy Waldron breached a duty of care owed to her when seizing the firearms. The evidence reflects that the deputies actually treated the Fernandez firearms with more care than Mr. Fernandez treated them. In addition, the Plaintiff's claim that the deputies damaged the firearms is not supported by any admissible evidence but is merely speculation. Nor can the Plaintiff offer evidence that Deputy Roth or Waldron's conduct was the proximate cause of action any damage to the firearms as she had no knowledge of their pre-search condition.

Based on the foregoing, the defendants are entitled to summary judgment in their favor on the Plaintiff's claim for negligence.

## V.    THE PLAINTIFF CANNOT PREVAIL ON HER CAUSE OF ACTION FOR BREACH OF A BAILMENT CONTRACT

/////

The Plaintiff's Fourth Claim is for Breach of Bailment under California law. "The FAC alleges that the defendants, as bailees failed to adequately care for the firearms, transporting and storing them in a way that tremendous damage resulted to them." [FAC, para. 125 (Ex. 1)]. The Plaintiff cannot prove the elements of a bailment claim against the County of Los Angeles.

"A bailment relationship is said to arise where an owner, while retaining title, delivers personalty to another for some particular purpose upon an express or implied contract. The relationship includes a return of the goods to the owner or a subsequent disposition in accordance with his instructions." *Lionberger v. United States*, 371 F.2d 831, 840 (Ct.Cl.1967); *see also* 19 Williston on Contracts § 53:1 (4th ed. 2012) (defining a bailment as "a delivery of personalty for some particular purpose, or on mere deposit, upon a contract, express or implied, that after the purpose has been fulfilled it shall be redelivered to the person who delivered it, or otherwise dealt with according to his directions, or kept until he reclaims it, as the case may be." (international quotation marks omitted). *Kam-Almaz v. United States*, 682 F.3d 1364, 1368 (Fed. Cir. 2012).

The Plaintiff in this case will offer no evidence to prove the required elements of a bailment. First, the Plaintiff did not voluntarily "deliver" the firearms to the County of Los Angeles, it is undisputed that they were involuntarily "seized" from her husband pursuant to several warrants. *See Goudy & Stevens, Inc. v. Cable Marine, Inc.,* 924 F.2d 16, 18 (1st Cir.1991).

-38-

The Plaintiff will offer no evidence of an express contract or agreement between her and the defendants with regard to the firearms seized.

The plaintiff will offer no evidence of the mutual intent required for an implied-in-fact contract. A seizure, essentially by definition, lacks mutual intent. _Kam-Almaz_, 682 F.3d at 1368. Thus, a seizure pursuant to the government's authority to police the border generally will not give rise to an implied-in-fact bailment contract. _See Llamera v. United States,_ 15 Cl.Ct. 593, 597 (1988).

Further, because the Plaintiff did not voluntarily deliver the firearms to the County, she has no evidence of any valid consideration necessary for a bailment contract. _See Llamera,_ 15 Cl.Ct. at 598. "The 'purely unilateral act' of seizing a person's personal property does not evidence intent to enter into a bailment contract." _Kam-Almaz_, 682 F.3d at p. 1369.

The Plaintiff will offer no evidence of any promise, representation, statement, or assertion by the County, Deputy Roth or Deputy Waldron that would have created an express implied-in-fact bailment contract with her. Finally, as with The Plaintiff's claim for negligence, _supra_, the Plaintiff will offer no evidence to prove that the firearms were not returned to her in the same condition as when they were seized.

Therefore, the County of Los Angeles is entitled to summary judgment on the Plaintiffs' claim for bailment.

/////

## VI.   THE PLAINTIFF CANNOT PROVE HER CLAIM FOR TRESPASS TO CHATTELS AGAINST THE DEFENDANTS

The Plaintiff's fifth claim is for Trespass to Chattels. It is alleged that the damage to the seized firearms was an intentional and substantial interference with the Plaintiff's enjoyment of her property. (FAC, para. 131). It is also alleged that the County exercised wrongful dominion and control over her property by demanding an excessive fine be paid prior to its return (FAC, para 133). The Plaintiff also alleges a theory of respondeat superior liability based on the alleged acts of Deputies Roth and Waldren. (FAC para 134). The defendants cannot be held liable for trespass to chattels under either theory.

A trespass to chattels cause of action "lies where an intentional interference with the possession of personal property has proximately caused injury." _Thrifty-Tel, Inc. v. Bezenek_, 46 Cal. App. 4th 1559, 1566 (1996). T]he tort of trespass to chattels allows recovery for interferences with possession of personal property 'not sufficiently important to be classed as conversion, and so to compel the defendant to pay the full value of the thing with which he has interfered.'" _Intel Corp. v. Hamidi_, 30 Cal.4th 1342, 1350 (Cal. 2003) (citation omitted). "Though not amounting to conversion, the defendant's interference must, to be actionable, have caused some injury to the chattel or to the plaintiff's rights in it." _Id._ Trespass to chattels is "an occasional remedy for minor interferences, resulting in some damage, but not sufficiently serious or sufficiently important to amount to the greater tort of

-40-

conversion." *Jamgotchian v. Slender*, 170 Cal.App.4th 1384, 1400-01 (2009); *Thrifty-Tel, Inc*., 46 Cal.App.4th at p. 1566-67.

In The instant case the Plaintiff cannot prove that assessing her the fee for return of the firearms constituted a trespass to chattels as the fee imposed upon her was reasonable and was actually less than the costs incurred by the County to seize, impound, store and release the firearms at issue in this case. *See Section II, above*.

Also, the Plaintiff will offer no evidence that the acts of Deputy Roth or Deputy Waldron were the proximate cause of any injury or damage to the seized firearms to support her cause of action for trespass to chattels. As set forth in detail under section III above, prior to the firearms in question were maintained in deplorable conditions, buried under debris piled 5-feet high, kept in a garage in the Agua Dulce desert without air conditioning, the firearms were damaged prior to the seizure.

Plaintiff Ana Fernandez has no knowledge of how many handguns or long guns were in her husband's possession in June 2018. [SUF, No. 63]. The Plaintiff is unaware of the condition of the firearms prior to the June 2018. And is unaware of whether her husband's collection of firearms was new or used. [SUF, No. 72]. The Plaintiff has no documentation showing the condition of the firearms prior to June 2018. [SUF, No. 73]. The Plaintiff cannot identify which, if any, of the seized firearms were allegedly damaged by the sheriff's department. [SUF, No. 74]. The Plaintiff has no knowledge of the value of the seized firearms prior to the seizure.

[SUF No. 68]. She has no receipts, no appraisals, and no evidence of insurance or insured value of the firearms prior to the seizure. [SUF Nos. 64-].

Based on the foregoing, the defendants are entitled to summary judgment on the Plaintiff's claim for trespass to chattels.

## VII. THE PLAINTIFF IS NOT ENTITLED TO DECLARATORY RELIEF

The Declaratory Judgment Act, codified as 28 U.S.C. § 2201(a), provides in pertinent part:

> In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

The DJA's operation "is procedural only." *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth,* 300 U.S. 227, 240, (1937). A DJA action requires a district court to "inquire whether there is a case of actual controversy within its jurisdiction." *American States Ins. Co. v. Kearns,* 15 F.3d 142, 143–144 (9th Cir.1994).

In the instant case, the Plaintiff's request for declaratory relief is derivative of her other claims. Because the Plaintiff's claims fail as a matter of law, the Plaintiff is not entitled to declaratory relief.

## VIII. THE PLAINTIFF CANNOT RECOVER PUNTIVE DAMAGES FROM THE COUNTY OF LOS ANGELES

A public entity cannot be sued under § 1983 as a matter of law for punitive damages. *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 271 (1981). Nor can

a public entity be sued for punitive damages under California law. Cal. Gov. Code § 818.

The prayer for punitive damages in this case must be stricken from all claims against the County of Los Angeles.

## **CONCLUSION**

Defendants COUNTY OF LOS ANGELES, JOHN ROTH and WYATT WALDRON are entitled to summary judgment of all claims on the ground that there are no triable issues of fact remaining in this case. The firearm fee assessed by the County was lower than the costs for actual workhours expenses to seize, impound, store and release the Fernandez firearms. The fee was reasonable under the Fourth Amendment. Deputies Roth and Waldron are entitled to qualified immunity under the Fourth Amendment as they neither violated the Constitution nor aby clearly established law. In addition, the Plaintiff cannot prove the essential elements of her state law claims and is not entitled to declaratory relief from the defendants, or punitive damages from the County of Los Angeles.

DATED: March 22, 2024             Respectfully submitted,

LOGAN MATHEVOSIAN & HUR LLP


By: s / Amber A. Logan
    AMBER A. LOGAN
    Attorneys for Defendant,
    County of Los Angeles