C.D. Michel – SBN 144258
Anna M. Barvir – SBN 268728
Matthew D. Cubeiro – SBN 291519
Konstadinos T. Moros – SBN 306610
MICHEL & ASSOCIATES, P.C.
180 E. Ocean Boulevard, Suite 200
Long Beach, CA 90802
Telephone: (562) 216-4444
Facsimile: (562) 216-4445
Email: cmichel@michellawyers.com

Attorneys for Plaintiff Ana Patricia Fernandez

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANA PATRICIA FERNANDEZ, an individual,<br><br>              Plaintiff,<br><br>   v.<br><br>LOS ANGELES COUNTY, et al.,<br><br>              Defendants. | Case No.: 2:20-cv-09876 DMG (PDx)<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing Date:   May 10, 2024<br>Hearing Time:   2:00 p.m.<br>Courtroom:   8C<br>Judge:   Hon. Dolly M. Gee |

# TABLE OF CONTENTS

**Page**

Table of Contents ................................................................................................. i

Table of Authorities .......................................................................................... iii

Introduction ......................................................................................................... 1

Statement of Facts .............................................................................................. 2

I.  California Penal Code Section 33880 and Los Angeles County's Fee for the Storage and Processing of Seized Firearms ................................................. 2

II.  The Seizure and Handling of Manuel Fernandez's Firearm Collection .................... 3

III.  The Release of the Seized Firearms to Carol Watson's Orange Coast Auctions ....... 5

IV.  Procedural History .......................................................................................... 6

Legal Standard .................................................................................................... 7

Argument .............................................................................................................. 8

I.  Defendants Are Not Entitled to Summary Judgment on the Fourth Amendment Claims ................................................................................. 8

    A.  The County Is Not Entitled to Summary Judgment Because There Is a Genuine Dispute Over the Reasonableness (and Legality) of the County's Firearm Release Fee and the County's Refusal to End the Seizure ............... 8

        1.  There Is No Dispute that the County May Impose Fees Relating to the Exercise of Constitutional Rights, and Ms. Fernandez Never Challenged the County's Authority To Do So .......................... 10

        2.  There Is a Genuine Dispute Over Whether the County's Firearm Release Exceeds the Actual Administrative Costs Incurred .............. 11

    B.  The Individual Defendants Are Not Entitled to Summary Judgment on the Fourth Amendment Claim Under the Doctrine of Qualified Immunity ........ 18

II.  Defendants Are Not Entitled to Summary Judgment on the Negligence Claims Because There Is a Genuine Dispute Over Whether Defendants Breached Their Duty of Care, Resulting in Damage to the Fernandez Firearms ............................ 22

    A.  The County Is Liable for the Negligence of Its Employees Under Government Code Section 815.2 ............................................................. 23

i

B.     There Is a Genuine Dispute Over Whether LASD Employees, Including Deputies Roth and Waldron, Breached Their Duty of Care and Damaged the Fernandez Firearms ................................................................... 25

III.   Defendants Are Not Entitled to Summary Judgment on the Trespass to Chattels Claim Because There Is a Genuine Dispute Over Whether Defendants Intentionally Interfered with Ms. Fernandez's Possessory Interest in Her Firearms ................................................................................................... 28

IV.    Defendants Do Not Argue They Are Entitled to Summary Judgment on the Breach of Constructive Bailment Claim................................................ 29

V.     If Ms. Fernandez's Constitutional Claim Survives Summary Judgment, She Is Entitled to Declaratory Relief..................................................................... 31

VI.    Ms. Fernandez Waives Her Claim for Punitive Fees Against the County ............... 31

Conclusion .......................................................................................................... 32

ii

TABLE OF CONTENTS

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alitalia v. Arrow Trucking Co.*,
   977 F. Supp. 973 (D. Ariz. 1997) ................................................................ 30

*Autotel v. Nev. Bell Tel. Co.*,
   697 F.3d 846 (9th Cir. 2012) ...................................................................... 31

*Bonds v. Cox*,
   20 F.3d 697 (6th Cir. 1994) ........................................................................ 18

*Brewster v. Beck*,
   859 F.3d 1194 (9th Cir. 2017) ............................................................ 8, 9, 10

*Christensen v. Hoover*,
   643 P.2d 525 (Colo. 1982) .......................................................................... 30

*City of Newport v. Fact Concerts, Inc.*,
   453 U.S. 247 (1981) .................................................................................... 31

*Eastburn v. Reg'l Fire Prot. Auth.*,
   31 Cal. 4th 1175 (2003) .............................................................................. 23

*Evan F. v. Hughson United Methodist Church*,
   8 Cal. App. 4th 828 (1992) ......................................................................... 22

*Gebert v. Yank*,
   172 Cal. App. 3d 544 (Ct. App. 1985) ........................................................ 30

*Harlow v. Fitzgerald*,
   457 U.S. 800 (1982) .................................................................................... 18

*Intel Corp. v. Hamidi*,
   30 Cal. 4th 1342 (2003) .............................................................................. 28

*Jamgotchian v. Slender*,
   170 Cal. App. 4th 1384 (2009) ................................................................... 29

*Jessop v. City of Fresno*,
   918 F.3d 1031 (9th Cir. 2019) ...................................................................... 9

*Johnson v. State of California*,
   69 Cal.2d 782 (1968) .................................................................................. 24

TABLE OF AUTHORITIES

*Koussaya v. City of Stockton*,
   54 Cal. App. 5th 909 (2020) ........................................................................ 23

*Kwong v. Bloomberg*,
   723 F.3d 160 (2d Cir. 2013) ........................................................................ 10

*Ladd v. Cnty. of San Mateo*,
   12 Cal. 4th 913 (1996) ................................................................................ 22

*Lavan v. City of Los Angeles*,
   693 F.3d 693 F.3d 1022 (9th Cir. 2012) ....................................................... 8

*Liston v. Cnty. of Riverside*,
   120 F.3d 965 (9th Cir. 1997) ................................................................. 19, 21

*Manuel v. City of Joliet*,
   -- U.S. --, 137 S. Ct. 911 (2017) .................................................................. 8

*McCorkle v. City of Los Angeles*,
   70 Cal.2d 252 (1969) .................................................................................. 24

*Mena v. City of Simi Valley*,
   226 F.3d 1031 (9th Cir. 2000) ............................................................... 19, 21

*Michel v. Smith*,
   188 Cal. 199 (1922) .................................................................................... 24

*Minsky v. City of Los Angeles*,
   11 Cal. 3d 113 (1974) ................................................................................. 30

*Morgan Stanley & Co. v. JP Morgan Chase Bank, N.A.*,
   645 F. Supp. 2d 248 (S.D.N.Y. 2009) ........................................................ 30

*Mozzetti v. Super. Ct.*,
   4 Cal.3d 699 (1971) .................................................................................... 30

*Newsome v. Erwin*,
   137 F. Supp. 2d 934 (S. D. Ohio 2000) ...................................................... 18

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*,
   210 F.3d 1099 (9th Cir. 2000) .................................................................. 7, 17

*Pearson v. Callahan*,
   555 U.S. 223 (2009) .................................................................................... 18

*Pivar v. Grad. Sch. of Figurative Art of the N.Y. Acad. of Art*,
   735 N.Y.S.2d 522 (1st Dep't 2002) ............................................................. 30

TABLE OF AUTHORITIES

*S.E.C. v. Seaboard Corp.,*
   677 F.2d 1301 (9th Cir. 1982) ............................................................... 7

*Sandoval v. Cty. of Sonoma,*
   72 F. Supp. 3d 997 (N.D. Cal. 2014) ............................................ 8, 10

*Thrifty-Tel, Inc. v. Bezenek,*
   46 Cal. App. 4th 1559 (1996) ............................................................ 29

*United States v. Alexander,*
   106 F.3d 874 (9th Cir. 1997) ............................................................ 22

*United States v. Jacobsen,*
   466 U.S. 109 (1984) ................................................................... 8, 18

*United States v. Place,*
   462 U.S. 696 (1983) ..................................................................... 8, 9

*Wikiert v. City of New York,*
   128 A.D.3d 128 (2015) ................................................................. 30

*Wilson v. Lynch,*
   835 F.3d 1083 (9th Cir. 2016) ......................................................... 10

*Wood v. Strickland,*
   420 U.S. 308 (1975) ....................................................................... 18

**Statutes**

18 U.S.C. § 1983 ............................................................................... 1

Cal. Gov't Code § 815 ..................................................................... 24

Cal. Gov't Code § 815.2 ..................................................... 23, 24, 29

Cal. Gov't Code § 818 ..................................................................... 31

Cal. Gov't Code § 820 ..................................................................... 23

Cal. Gov't Code § 820.2 ................................................................. 24

Cal. Gov't Code § 820.4 ................................................................. 29

Cal. Penal Code § 33880 ................................................ 2, 11, 12, 13

**Rules**

Fed. R. Civ. P. 56 ............................................................................. 7

TABLE OF AUTHORITIES

**Other Authorities**

Keeton, W. Page, et al.,
   *Prosser and Keeton on Law of Torts* § 14 (5th ed. 1984)................................................ 28

Wikipedia, Cosmoline,
   https://en.wikipedia.org/w/index.php?title=Cosmoline&oldid=1217667943 ................ 27

**INTRODUCTION**

In June 2018, Defendants seized well over 400 firearms from Plaintiff Ana Patricia Fernandez's now-deceased husband, Manuel Fernandez. At the time of the seizure, Mr. Fernandez was prohibited from owning firearms and, on an anonymous tip, Defendant LASD Deputies Wyatt Waldron and John Roth executed a series of warrants to search Mr. Fernandez's properties and dispossess him of his firearm collection. They arrested Mr. Fernandez and charged him with unlawful possession of firearms. But sadly, Mr. Fernandez passed away, and the charges against him were dropped. Upon his passing, Mrs. Fernandez, became the sole owner of the firearms, which remained in LASD's custody under the care of various LASD employees.

When Mrs. Fernandez tried to retrieve her firearms to sell at auction, she learned that she would have to pay $54 per firearm—a "firearm release fee" that Defendant County of Los Angeles enacted to cover its "administrative costs." Because such a fee would amount to tens of thousands of dollars—an amount likely exceeding the costs incurred in seizing, processing, and storing the firearms (in violation of state law)—Mrs. Fernandez tried to negotiate a more reasonable fee. Defendants refused. So Mrs. Fernandez paid the "fee" under protest to secure the release of her property and to prevent the firearms' lawful destruction under state law. After paying over $24,000, Mrs. Fernandez discovered that while her firearms were in the Defendants' custody, they were handled so poorly that significant damage was done to them—leading to more than $40,000 in lost value. Mrs. Fernandez thus sued on various grounds, alleging that County employees, including Deputies Roth and Waldron, mishandled her firearms, both in their seizure and in their transport, handling, and storage, resulting in considerable damage.

After several motions to dismiss, Ms. Fernandez still has an active federal claim against the County and Individual Defendants Roth and Waldron under 18 U.S.C. § 1983 for violating her Fourth Amendment rights, as well as supplemental state-law claims for negligence, trespass to chattels, and breach of constructive bailment. Defendants thus bring this motion for summary judgment. It should be denied. Defendants' motion fails to

1

prove they are entitled to judgment as a matter of law. Instead, it selectively presents facts, stretches authorities beyond their limits, and makes arguments on false premises. But most significantly, the countless glaring disputes over material facts precludes the entry of summary judgment.

## STATEMENT OF FACTS

### I. CALIFORNIA PENAL CODE SECTION 33880 AND LOS ANGELES COUNTY'S FEE FOR THE STORAGE AND PROCESSING OF SEIZED FIREARMS

State law authorizes California cities, counties, and state agencies to impose, at their discretion, a charge "equal to its *administrative costs* relating to the seizure, impounding, storage, or release of any firearm, ammunition feeding device, or ammunition." Cal. Penal Code § 33880 (a) (emphasis added); SUMF Nos. 93-95.[1] Any fee set by local authorities to recover these costs, however, "shall not exceed the actual costs incurred for the expenses directly related to taking possession of a firearm, storing the firearm, and surrendering possession of the firearm to a licensed firearms dealer or to the owner." *Id.* § 33880(b); SUMF No. 95.

In 2005, under this authority, Los Angeles County adopted a fee of $54 per firearm seized—purportedly to recover the costs of processing and storing the seized property. SUMF No. 97. In a letter supporting the fee's adoption, then-Sheriff Baca submitted a cost breakdown alleging that for each firearm seized, LASD personnel devoted about 90 minutes of work, costing the department about $54. SUMF No. 98-99. Sheriff Baca added: "[A]n analysis of firearms evidence processing over a four-year period revealed that potentially 500 guns per year would be eligible for the administrative fee" and the fee "would yield additional revenue of approximately $27,000 each year." SUMF No. 99. He also provided a table of administrative tasks associated with the seizure, impounding, storage, and release of firearms in LASD custody and an estimate of the actual costs

---

[1] Throughout this brief, Fernandez cites to Plaintiff's Statement of Genuine Disputes of Material Fact to support factual assertions. Facts alleged to be uncontroverted by either party are cited as "SUMF," and facts the parties dispute are cited as "RSUMF."

2

associated with those tasks. SUMF Nos. 100-101.

Neither the County nor LASD conducts a regular review of the administrative fee for the release of firearms to determine whether the fee reflects "the actual administrative costs associated with taking possession of a firearm, storing the firearm, and surrendering possession of the firearm to a licensed firearms dealer or to the owner." SUMF No. 101. And the County has not changed the amount of the fee since it was adopted in 2005— nearly 20 years ago. SUMF No. 104.[2]

## II.   THE SEIZURE AND HANDLING OF MANUEL FERNANDEZ'S FIREARM COLLECTION

Plaintiff Ana Patricia Fernandez's late husband, Manuel Fernandez, was legally prohibited from owning firearms because of a felony conviction stemming from 2009. SUMF No. 1. Apparently unaware of his prohibited status, Mr. Fernandez spent many years engaged in the hobby of collecting and shooting firearms. "He loved them. It was his passion." Logan Decl., Ex. 2 [Fernandez Dep.] at 24:1-3. By the summer of 2018, he had accumulated over 500 firearms, most of which he kept in his home, stored in either the boxes they came in, gun cases, or gun safes, or he otherwise wrapped them in cloths, towels, or similar materials to prevent damage. SUMF No. 72.

In the summer of 2018, acting on an anonymous tip, Defendant LASD, including Defendants Deputy Wyatt Waldron and Deputy John Roth, executed three search warrants, seizing Mr. Fernandez's valuable firearm collection, as well as non-firearm property, including electronics, ammunition, magazines, and firearm parts. SUMF Nos. 2-7, 20-22, 24-27.

On June 14, 2018, during the first search of the Fernandez residence on Caprock Road, LASD officers discovered and seized about 400 firearms. SUMF No. 7. Unprepared to properly handle and transport such a large seizure, under the supervision and direction

---

[2] This can be reasonably inferred from the fact that the fee is the same as it was when it was adopted in 2005. RUSMF No. 104. In discovery, when asked to provide information about whether the County had ever changed the fee, the County indicated that it was still investigating and would respond to the request via supplemental response. Barvir Decl., Ex. I at 485. It never did. *See generally id.*, Ex. J.

OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

of Deputy Wyatt Waldron, LASD personnel put "a couple hundred" or "the majority of firearms" in the bed of a pickup truck for transport to the Palmdale Station. RSUMF No. 84. When they ran out of room in the pickup truck, they "us[ed] the back seats and trunks of different L.A. County patrol vehicles." RSUMF No. 84. Waldron also admitted that there were no "measures taken to prevent damage" "during the transportation of this large collection of firearms." RSUMF No. 84. Rather, the firearms, having been removed from the boxes, cases, safes, and cloth wrappings in which Mr. Fernandez stored them, were tossed into the bed of a truck and the backs of squad cars without being separately packaged or wrapped to prevent damage during transport. RSUMF No. 84.

In compliance with LASD Policy for the handling of bulk property, the officers contacted Central Property & Evidence and requested that CPE custodians come to Palmdale to retrieve the unusually large number of seized items immediately. SUMF Nos. 11, 106, 111. But CPE personnel "did not have the time or manpower" to comply with the policy that day. SUMF Nos. 11, 106, 111. Instead, CPE custodians directed Palmdale personnel to begin the process of verifying the seized property. SUMF Nos. 11, 111. Before booking the firearms into evidence, however, LASD deputies (including Deputies Roth and Waldron) sprawled the seized firearms out on hard, bare cement for a photo op without anything to protect the firearms from scratches, dents, or other damage. RSUMF No. 90. From there, officers took the seized guns, in small batches, into the station to begin processing the firearms and entering them into PRELIMS (Property Evidence and Lab Information System). SUMF Nos. 31-32.

On June 20, 2018, LASD officers, under the direction of Deputy John Roth, executed a second search warrant at the Caprock residence to search for electronic evidence" that Mr. Fernandez was involved in illicit firearm sales. RSUMF No. 24; SUMF No. 26. This time, deputies discovered about 100 additional firearms, seized them, and transported them to the Palmdale Station to be booked along with the evidence from

the seizure. SUMF No. 28.[3]

The process of entering all the firearms seized from Mr. Fernandez into PRELIMS involved several officers working about 33 hours in total. RSUMF No. 36.[4] An unknown number of unidentified officers later spent a few minutes entering each of the Fernandez firearms into California's Automated Firearms System (AFS). RSUMF No. 41. Additional time was allegedly spent by Property Custodian O'Leary Brown clearing guns (again), reviewing crime returns, adjusting the PRELIMS entries, researching foreign-made firearms, and storing the guns (again), SUMF No. 42, but the time she reasonably spent doing this repetitive work is hotly disputed, RSUMF No. 42. *See also* Pls.' Sep. State. Evidentiary Obj. No. 14.

## III. THE RELEASE OF THE SEIZED FIREARMS TO CAROL WATSON'S ORANGE COAST AUCTIONS

After Mr. Fernandez was charged with unlawful possession of firearms, but before any trial, he passed away, and the charges against him were dismissed. SUMF No. 112. Ownership of the firearms was then passed to his wife, the plaintiff, who was never prohibited from owning or possessing firearms. SUMF Nos. 113-14. When Ms. Fernandez tried to retrieve her property from LASD, however, she learned that she would have to pay $54 per firearm to recover her property. Ultimately, applying the County's per-firearm fee to Ms. Fernandez's extensive collection would result in an exorbitant cost of tens of thousands of dollars. That fee far exceeds the actual administrative costs LASD incurred. SUMF Nos. 4, 9, 14-15, 20-21, 23, 25, 29, 43, 46-49, 51, 53, 55; *see also* Mot. 8-18 (including all manner of non-administrative costs in the calculation of the fee).

Ms. Fernandez, through her attorney, thus offered to pay an amount reflecting the

---

[3] Another 26 firearms were discovered and seized at the home of Ms. Carey Moisan on Sweetwater Drive. SUMF No. 19; RSUMF No. 22. Those firearms, however, are not the subject of this litigation.

[4] Defendants dispute this number, claiming it took 10 officers (and Property Custodian Susan O'Leary Brown) at least 128 hours to enter the firearms in PRELIMS. SUMF No. 36. The evidence, however, does not support such a drastically inflated number. RSUMF No. 36; *see also* Pls.' Sep. State. Evidentiary Obj. No. 12.

OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

County's actual costs. The County would not budge, demanding that Ms. Fernandez pay $24,354 to recover her own lawful property. SUMF No. 115. Fearing the destruction of her firearms, Ms. Fernandez agreed to pay the fee under protest, informing attorneys for the County that she was paying "to stop any claim that the continued storage of the firearms justifie[d] the current or any additional storage fees." Barvir Decl., Ex. R (letter from attorney Matthew D. Cubeiro to Deputy City Attorney Lana Choi). But she remained open to negotiating a reasonable lower fee with the County. *Id.*

Ms. Fernandez requested that LASD release her 461 legal firearms to employees of Carol Watson's Orange Coast Auctions, a properly licensed firearm dealer, to be sold at auction. SUMF Nos. 116-117. When Carol Watson and her staff picked up the Fernandez firearms at the Palmdale Station, Watson noticed that the firearms had not been carefully handled by LASD personnel. SUMF No. 118. Rifles were stored in trash cans, plastic tubs, and similar containers. SUMF No. 118. They were not individually wrapped or boxed to prevent dings, scratches, and other damage while being carried or transported. SUMF No. 118.  Valuable guns were "stacked like cordwood." Watson Decl., ¶ 7. Because of this poor handling, there was visible damage, breakage, and scratches to the gun stocks. SUMF No. 118.

Upon release of the firearms to Carol Watson's Orange Coast Auctions, Ms. Watson and her staff began the process of preparing the firearms for auction. SUMF No. 119. This process includes, among other things, creating descriptions of the make, model, condition, and appraisal value of each gun. SUMF No. 119. Ultimately, the auction house estimated that the damage to the firearms decreased their value by $43,490 to $47,710. SUMF No. 121-22.

## IV.   PROCEDURAL HISTORY

Ms. Fernandez timely submitted a Government Tort Claim form to the county of Los Angeles on February 24, 2020. SUMF No. 123. The County served its rejection of Ms. Fernandez's claim on April 28, 2020, SUMF No. 123, giving Ms. Fernandez until October 28, 2020, to sue under Government Code § 945.6. Ms. Fernandez sued on

October 27, 2020. *See* Compl., ECF No. 1. Defendants then brought several successful motions to dismiss. Cnty. Defs.' Mot. Dismiss, Dkt No. 15; Def. Brown's Mot. Dismiss, ECF No. 18; Defs.' Waldron & Roth's Mot. Dismiss, ECF No. 21; Order Re: Defs.' Mot. Dismiss, Sept. 20, 2021, Dkt. No 30. Ms. Fernandez, having been granted leave to amend, then filed her First Amended Complaint, naming previously unidentified Doe Defendants and curing the deficiencies identified in the Court's order. First Am. Compl., ECF No. 31.

Defendants brought motions to dismiss the First Amended Complaint, successfully defeating all claims against Individual Defendants Brown, Leon, Jacob, Roach, Moreno, Ames, Dingman, and Saylor, LASD, and Sheriff Villanueva, as well as Plaintiff's Eighth Amendment claim against L.A. County. Order Re: Defs.' Mots. Dismiss 13, Sept. 28, 2022, ECF No. 53. The Court also dismissed Ms. Fernandez's claims against Individual Defendants Roth and Waldron "for violating the Fourth Amendment by assessing an unlawful fee," but not her claims against Roth and Waldron for damage done during the initial seizure. *Id.*

The remaining defendants, the County, Roth, and Waldron, now bring this motion for summary judgment as to Ms. Fernandez's remaining claims under the Fourth Amendment, negligence, trespass to chattels, and breach of constructive bailment, as well as her claim for declaratory relief.

## LEGAL STANDARD

Summary judgment is appropriate only when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth." *S.E.C. v. Seaboard Corp.*, 677 F.2d 1301, 1306 (9th Cir. 1982). Defendants—as the moving party—carry both the "initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). "If a moving party fails to carry its initial burden of production, *the nonmoving party has no obligation to produce anything*, even if [she]

would have the ultimate burden of persuasion at trial." *Id.* at 1102-03 (emphasis added). On the other hand, if the moving party does carry its burden, the non-moving party need only produce "enough evidence to create a genuine issue of material fact." *Id.* at 1103. In either case, the non-moving party defeats the motion. *Id.*

For the reasons below, Defendants' motion should be denied.

## ARGUMENT

I. **DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THE FOURTH AMENDMENT CLAIMS**

   A. **The County Is Not Entitled to Summary Judgment Because There Is a Genuine Dispute Over the Reasonableness (and Legality) of the County's Firearm Release Fee and the County's Refusal to End the Seizure**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search and seizures[.]" U.S. Const. amend. IV. It applies equally to searches made "unreasonable" by the government's refusal to return property validly seized. Indeed, the Supreme Court has long held that "[a] seizure lawful at its inception can nevertheless violate the Fourth Amendment because the manner of execution unreasonably infringes possessory interests protected by the Fourth Amendment[.]" *United States v. Jacobsen*, 466 U.S. 109, 124 (1984) (citing *United States v. Place*, 462 U.S. 696, 707-10 (1983)); *see also Sandoval v. Cty. of Sonoma*, 72 F. Supp. 3d 997, 1004 (N.D. Cal. 2014) (holding that the Fourth Amendment "is implicated by a delay in returning the property, whether the property was seized for a criminal investigation, to protect the public, or to punish the individual").

The Ninth Circuit has confirmed that "[t]he Fourth Amendment doesn't become irrelevant once an initial seizure has run its course." *Brewster v. Beck*, 859 F.3d 1194, 1197 (9th Cir. 2017) (citing *Jacobsen*, 466 U.S. at 123 & n.25; *Lavan v. City of Los Angeles*, 693 F.3d 693 F.3d 1022, 1030-31 (9th Cir. 2012); *Manuel v. City of Joliet*, -- U.S. --, 137 S. Ct. 911, 914, 920 (2017)). On the contrary, "[a] seizure is justified under the Fourth Amendment only to the extent that the government's justification holds force. *Thereafter, the government must cease the seizure or secure a new justification*."

*Brewster*, 859 F.3d at 1197. If it does neither, a seizure reasonable at its inception becomes unreasonable. *Id.* (emphasis added).[5] The relevant question is thus whether the County had a reasonable justification for its refusal to release the seized firearms when Ms. Fernandez demanded them. *See Place*, 462 U.S. at 703. On this question, the County's moving papers do not establish that it is entitled to judgment as a matter of law. Rather, the County's motion highlights that this claim turns on a disputed question of the reasonableness of the County's conduct, making summary judgment improper.

Recall that the only justification the County had for the initial seizures was that Mr. Fernandez was a prohibited person, and the relevant warrants were issued to dispossess him of his firearms and other evidence of potential firearm-related crimes. SUMF Nos. 1-3, 7, 19-20, 24, 27. When Mr. Fernandez died, the County dismissed the charges against him, and ownership of the seized firearms passed to Ms. Fernandez, who was not prohibited from owning or possessing firearms. SUMF No. 114. At that point, the initial justification for the seizure expired, requiring the County to secure a new justification to continue the seizure of Mrs. Fernandez's property. *See Brewster*, 859 F.3d at 1197. But the County has presented no justification for its refusal to end the seizure of the Fernandez firearms apart from its insistence that Mrs. Fernandez pay a fee of $24,354 for the release of her guns—a point Defendants admitted in earlier motions. *See, e.g.*, Employee Mot. Dismiss First Am. Compl. 8.

To be sure, continuing an otherwise lawful seizure until the property claimant pays a reasonable administrative fee reflecting the actual costs incurred by the government may be permissible under the Fourth Amendment. *Cf. Brewster*, 859 F.3d at 1198 (upholding a law authorizing impoundment to penalize a driver with a suspended license only until the vehicle owner provides proof of valid license and registration against a Fourth Amendment challenge). But holding a citizen's property hostage until she agrees to pay

---

[5] *But cf. Jessop v. City of Fresno*, 918 F.3d 1031, 1036 (9th Cir. 2019) (holding that plaintiff did not have an established right under the Fourth Amendment to not have seized property stolen by police officers).

OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

the government tens of tens of thousands of dollars—a fee the evidence shows far exceeds the administrative costs the government actually incurs—is plainly *unreasonable*. Indeed, the government profiting off seized property it no longer has probable cause to hold is repugnant to the purpose of the constitutional protection against unreasonable seizures.

In short, based on no more than the County's unreasonable demand that Ms. Fernandez pay an unlawful firearm release fee, the County refused to end the seizure and return Ms. Fernandez's legally owned property, converting the once lawful seizure into an unlawful one. The County's delay in returning the property is a harm actionable under the Fourth Amendment. *See Sandoval*, 72 F. Supp. at 1004; *Brewster*, 859 F.3d at 1197. The County is not entitled to summary judgment on the Fourth Amendment claim

### 1. There Is No Dispute that the County May Impose Fees Relating to the Exercise of Constitutional Rights, and Ms. Fernandez Never Challenged the County's Authority To Do So

The County briefly argues that it may pass on the costs of the firearm seizure because "[t]he government has a 'long-recognized ability to impose fees relating to the exercise of constitutional rights when those fees are designed to defray the administrative costs of regulating protected activity.'" Mot. 7 (citing *Wilson v. Lynch*, 835 F.3d 1083, 1097 (9th Cir. 2016) (quoting *Kwong v. Bloomberg*, 723 F.3d 160, 165 (2d Cir. 2013)). But the cases the County relies on involve citizens seeking to affirmatively exercise their rights to engage in protected conduct and being met with fees related to that exercise. This case is *not* about the government's authority to recover the costs it incurred incident to one's exercise of their rights. Ms. Fernandez did not seek to exercise any constitutional right at all. Rather, she claims that the County unjustifiably refused to end its seizure of her property unless she paid an excessive (and unlawful) fee. In that sense, the County has not simply imposed fees on the exercise of Ms. Fernandez's constitutional rights, it has imposed a fee that she must pay before it would end its violation of her rights.

What's more, Ms. Fernandez does not even challenge the County's authority to charge her a fee for the release of her firearms. She does, however, challenge the legality of that fee because it is *not* reasonably designed to defray the administrative costs

OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

associated with the seizure, impounding, storage, and release of her property, and it exceeds the clear bounds set by Penal Code section 33880(a). Neither the County nor LASD conducts a regular review of the $54 fee for the release of firearms to determine whether the fee reflects its actual administrative costs, SUMF No. 102, nor has the County changed the fee in nearly 20 years, SUMF No. 104.

## 2.   There Is a Genuine Dispute Over Whether the County's Firearm Release Exceeds the Actual Administrative Costs Incurred

Ms. Fernandez claims that the County's "firearm release fee" of $54 per gun far exceeds the actual administrative expenses the County is authorized to recover under California Penal Code section 33880. As will be shown, her claim is especially clear in the context of the bulk seizure of over 500 guns from a single source. In response, the County claims that LASD employees spent hundreds of hours engaged in activities related to the Fernandez firearms and thus *could* have demanded that Ms. Fernandez pay upwards of $45,181.88 for the privilege of having her lawful property returned to her. Mot. 19-20. The County is wrong as a matter of fact and law. Its argument rests on an overly broad interpretation section 33880, as well as an unreasonable calculation of the administrative cost of processing, storing, and releasing Ms. Fernandez's firearms based on misrepresentations of the evidence, the inclusion of unnecessarily duplicative work, and an inflated average employee hourly wage.

First, and most egregiously, the County tries to justify the exorbitant fee it charges by padding the record with irrelevant evidence of all manner of investigatory activities and general police work related to Mr. Fernandez's criminal case. Mot. 8-18. The County's motion recounts such tasks as:

- Receiving and investigating a tip, researching Mr. Fernandez's criminal history, conducting surveillance of Mr. Fernandez's home, and drafting warrant affidavits, SUMF Nos. 3-4 (approximately 14 hours), 20 (unknown hours); 25 (3 hours);

- Going to court to obtain warrants, SUMF Nos. 4, 25 (unknown hours);

- Station briefing and executing multiple search warrants by dozens of deputies and detectives, SUMF Nos. 9 (2 hours), 15 (about 74 hours), 21

11

(20 hours), 29 (36 hours);[6]

- Driving to and from the site of the searches and unloading seized property, SUMF Nos. 14 (3.25 hours), 16 (80-150 hours), 21 (2.5 hours);

- Driving back and forth between the Palmdale Station and Central Property and unloading the property by at least 4 property custodians several times, SUMF Nos. 43 (16 hours), 32 (32 hours);

- Transferring about 100 handguns to the National Integrated Ballistic Information Network (NIBIN), a wholly voluntary program, SUF No. 52-53 (unknown hours); and

- Investigating and testing of about 100 handguns via NIBIN for evidence of their use in other crimes throughout the country, SUMF No. 55 (48-97 hours).

Including the investigatory activities and general police work, the County inappropriately packs the record with between 330 and 450 hours (plus any number of "unknown hours") to justify the fee it charges.

But section 33880 authorizes the County to levy a fee no greater than the actual "*administrative* costs relating to the seizure, impounding, storage, or release of any firearm, ammunition feeding device, or ammunition." Cal. Penal Code § 33880(a) (emphasis added). Administrative costs are generally understood to include those day-to-day expenses relating to the administrative acts of a business or organization, not its policy and programmatic functions. In this case, such expenses are limited to those associated with processing and storing seized property, and then releasing it to the rightful owner or a licensed dealer. SUMF Nos. 93-96.

Before this lawsuit required the County to justify its unreasonably high fee, both the County and LASD understood that section 33880 limited its authority to recover its expenses in this way. For instance, when urging the County to adopt the fee in 2005,

---

[6] This includes executing a second warrant to search the Caprock residence for evidence of illegal gun sales, including cell phones, tablets, laptops, and other electronic components. SUMF No. 29 (39 total hours); RSUMF No. 24. Deputy Roth did not apply for that second warrant to search for more firearms, nor did he expect to find any since the first search had been conducted just days before. RSUMF No. 24. About 100 additional firearms were discovered during the second search, SUMF No. 27, but that was not the purpose of the search, so the law enforcement activities that took place that day would have taken place regardless, RSUMF No. 24.

OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

former Los Angeles Sheriff Leroy D. Baca identified only tasks that one could reasonably consider to be related to "processing" or "storing" firearms. SUMF No. 100.[7] At the station level, this includes booking, entering information into AFS, verifying information and storing the arms, updating records, and preparing to transfer to CPE. SUMF No. 100. And at CPE, this includes verifying information upon receipt from the station, storing the arms, entering information into databases, verifying court order to release to owner, and updating PRELIMS and AFS. SUMF No. 100. He never suggested that conducting a stakeout, going to court to obtain a warrant, or taking any number of officers to raid a home constituted "administrative" work the cost of which could rightly be recovered under section 33880(a)—or even the County's own resolution adopting the fee. *See* Barvir Decl., Ex. E [LA Cnty. BOS File] at 290-91, 295. And for good reason. It was a "storage fee"—as even LASD's own policy describes. Barvir Decl., Ex. L [LASD Policy & Procedures]; SUMF No. 105.

The law was not intended to give the County the authority to pass on the heavy cost of everyday law enforcement activities—costs that should rightly be borne by the public at large—to gun owners simply because guns (instead of other types of property) are involved. The legislative history of Penal Code section 33880 memorializes that intent. SUMF Nos. 93-96. Indeed, a bill analysis from the Senate Committee on Public Safety, prepared during the consideration of AB 2431 in 2004, suggests tweaking the bill's language to ensure that it more clearly articulates the understood legislative intent that the law—i.e., authorizing a fee to recover the costs of "storage and *not for the overall costs of law enforcement* or the court for taking possession or custody of the firearm(s) *outside of the usual 'storage' environment* while still including the transfer of the firearm to a licensed dealer if appropriate." Req. Jud. Ntc., Ex. B (emphasis added); SUMF No. 96. The Assembly Floor Analysis concurring in the Senate's amendments confirmed that

---

[7] While the letter and supporting chart of administrative costs were submitted by Sheriff Baca, the station-level and CPE-level cost calculations were based on information provided by the Manager of CPE. Barvir Decl., Ex. E [LA Cnty. BOS File] at 295.

13

intent, describing the fee as a mere "storage fee." Req. Jud. Ntc., Ex. C; SUMF No. 96.

This must be the proper reading of the law. Otherwise, the fee becomes less about recovering the administrative expenses associated with taking possession of, processing, storing, and releasing seized arms, and more about penalizing those who own firearms and, for whatever reason, find their guns in the hands of the government. Ultimately, wherever the dividing line between "administrative" and "non-administrative" costs may lie, there can be no serious dispute that the County's dubious attempt to include all manner of general law enforcement work is on the wrong side of it.

Second, the County tries to pass on the costs of its unreasonably duplicative administrative work—work that was done in violation of LASD's own policies—to Ms. Fernandez. According to LASD Policy 5-04/070.30, regarding the storage of bulk evidence, the Fernandez firearms should have gone *immediately* to CPE for initial processing and booking. SUMF No. 106. That policy was not followed—even though Palmdale officers requested CPE's involvement since the seizure was "beyond the capabilities of a patrol station detective as far as logistically managing [the] evidence and transporting it." Logan Decl., Ex. 11 [Roth Dep.] at 115:22-23; SUMF Nos. 11-12, 111. CPE just "did not have the time" to follow policy related to Mr. Fernandez's uniquely large firearm collection. SUMF Nos. 12, 111. If the policy had been followed, Palmdale personnel would not have had to process the property at all. RSUMF No. 46. And any work being done by CPE to verify work already done by the Palmdale officers was an unreasonable duplication of efforts. *See* SUMF Nos. 46-49 (discussing the many steps CPE took to process the firearms a second time for a total of 74 hours). Ms. Fernandez is sympathetic to the fact that CPE may have lacked the "manpower" to retrieve the guns and process them in accordance with policy. SUMF No. 11. But gun owners should not bear the financial brunt of LASD being short-staffed. At a minimum, whether it is reasonable for the County to pass on the cost of its duplicative efforts to Ms. Fernandez is a disputed question of fact for the jury, making summary judgment inappropriate.

Ultimately, the County claims that its employees spent "at a minimum of 826.75

OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

and as many as 949.75" work hours related to the seizure of the Fernandez firearms, but this estimate includes *hundreds* of hours of non-administrative law enforcement work not recoverable under section 33880 and duplicative efforts by CPE. Mot. 8-18; SUMF Nos. 4, 9, 14-15, 20-21, 23, 25, 29, 43, 51, 53, 55 (non-administrative work); SUMF Nos. 46-49 (duplicative CPE work). The total claimed hours plummet to just 406 (plus the County's unaccounted-for "unknown hours") when considering only non-duplicative administrative tasks related to processing and storing. SUMF Nos. 36, 41-42, 50, 57, 59-60. It falls further, still, because many of the County's claimed hours are either unreasonable or unsupported by admissible evidence. SUMF Nos. 36, 41-42, 50, 57, 59-60; Barvir Decl., ¶ 21, fig. A; Pl.'s Sep. State. Evidentiary Obj. Nos. 4, 14, 22-23, 27. Generously estimating that LASD employees reasonably devoted 175 hours to administrative functions related to the Fernandez firearm seizure, storage, and release, Barvir Decl., ¶ 21, fig. A (more than double the total "Supported Hours" to account for the County's "unknown hours"), LASD realistically spent, on average, less than 25 minutes of recoverable time per firearm.

Next, the County inflates the average hourly rate of the LASD employees involved in the "seizure, impounding, storage, or release of" the Fernandez firearms:

> In June 2018, the lowest hourly pay for a Department employee who worked on the Fernandez firearms was $28.25 per hour. The highest hourly pay was $81.05 per hour. **Averaging the highest and lowest hourly wage brings the average hourly pay to $54.65 per hour**.

Mot. 19 (emphasis added).

To support this claim, the County includes the rates of senior-ranking sergeants and lieutenants who were not involved in administrative functions related to the Fernandez seizure—including Lt. Brian Gillis, who was the highest-paid officer listed in Exhibit 17A but was not responsible for *any* task related to the Fernandez firearms at issue. SUMF No. 61; RSUMF No. 61; Logan Decl., Ex. 17A. At the same time, the County excludes the rates of six Sheriff Station Clerks who made substantially less than $28.25 per hour.

*Compare* Mot. 19 *with* Logan Decl., Ex. 17A (identifying Station Clerks making between $20.58 and $22.91). The County also engages in a little mathematical sleight of hand, calculating the average hourly rate by simply adding the highest and lowest wage and dividing it by two. Mot. 19 (($28.25 + $81.05) / 2 = $54.65). This assumes that each employee's hourly rate is equally weighted; that is, it assumes that an equal number of high-paid supervisors and lower-paid custodians and clerks worked the case for an equal amount of time. That assumption is neither supported by the record nor realistic as a practical matter.[8]

But even if the County's mathematical process made sense, the average hourly rate is only **$40.28** when the hourly rates of Lt. Gillis and other officers not involved in administrative tasks are excluded. RSUMF No. 61; Logan Decl., Ex. 17A. And it is only **$36.45** when the rates of the lowest-paid Station Clerks are included. At these rates, it would have been reasonable to demand that Ms. Fernandez pay only between $6,378.75 and $7,049 (or between $14.14 and $15.62 per gun). *See* p.14, *supra* (citing Barvir Decl., ¶ 21, fig. A) (175 hrs. x $36.45 = $6,378.75 and $6,378.75 / 451 = $14.14; 175 hrs. x $40.28 = $7,049 and $7,049 / 451 = $15.62). The fees charged—$54 per gun for a total of $24,354—far exceed that reasonable amount.

Finally, though the County does not rely on Sheriff Baca's 2005 time-and-cost estimate in its motion, Ms. Fernandez must address its limited value in determining the actual cost of processing, storing, and releasing seized firearms in 2018—especially from a uniquely large seizure. According to Sheriff Baca's estimate before the adoption of the fee, one would have expected it to take about 678.5 hours to process and store 451 firearms (90 minutes per gun). Barvir Decl., Ex. E [LA Cnty. BOS File] at 295. Even taking the County's inflated claim of 406 hours of administrative time at face value,

---

[8] That's not how it works in the real world, and it's not how Sheriff Baca and CPE Manager calculated it in 2005 either. Barvir Decl., Ex. E [LA Cnty. BOS File] at 295 (calculating the administrative fee by weighing the wages of employees based on the amount of time they each were likely to spend on administrative activities).

16

OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

SUMF Nos. 36, 41-42, 50, 57, 59-60, it took LASD employees *well over 200 fewer hours* to process, store, and release the Fernandez firearms. As Ms. Fernandez has opined, this is likely due to Sheriff Baca's failure to consider an "economy of scale"—i.e., the fact that it would take less time per gun on average when making a bulk seizure from a single source than from hundreds of individual sources. *See, e.g.*, First Am. Compl. ¶¶ 83-84; Opp'n Cnty. Mot. Dismiss 2-3, Jan. 8, 2021, ECF No. 26; Opp'n Cnty. Emp. Defs.' Mot. Dismiss First Am. Compl. 2-3, Dec. 23, 2021, ECF No. 48.

For instance, Sheriff Baca's estimate includes time for work done at both the station level *and* CPE. Barvir Decl., Ex. E [LA Cnty BOS File] at 295. But under the LASD Policy for bulk seizures, most of the time spent at the station (i.e., 25 minutes spent "booking" the firearms and "enter[ing] information to DOJ/AFS") would not be done by deputies at the station, but by non-sworn employees with much lower hourly rates at CPE. *Id.*; SUMF Nos. 61, 106. And some tasks done at CPE, like verifying that the station-level work was correct, are unnecessary when bulk seizures are immediately received and processed by CPE. Barvir Decl., Ex. E [LA Cnty BOS File] at 295; SUMF No. 106. Ultimately, Sheriff Baca's $54 fee calculation was merely an estimate that did not hold true in reality. The County has never revised the fee, nor does it evaluate the fee regularly to ensure that it does not exceed the costs authorized by law. SUMF Nos. 102, 104. In other words, the County does not really know the actual "administrative costs associated with taking possession of a firearm, storing the firearm, and surrendering possession of the firearm to a licensed firearms dealer or to the owner." SUMF No. 103.

* * * *

The County has "fail[ed] to carry its initial burden of production" for summary judgment. *Nissan Fire*, 210 F.3d at 1102. So, Ms. Fernandez "has no obligation to produce anything, even if [she] would have the ultimate burden of persuasion at trial." *Id.* at 1102-03. At a minimum, Ms. Fernandez has produced "enough evidence to create a genuine issue of material fact," *id.* at 1103, about whether the County's fee exceeds the actual administrative costs incurred and, by extension, the reasonableness of the County's

refusal to end the seizure of Ms. Fernandez's firearms.

**B.   The Individual Defendants Are Not Entitled to Summary Judgment on the Fourth Amendment Claim Under the Doctrine of Qualified Immunity**

Government destruction of property has long been held to be "meaningful interference" constituting a seizure under the Fourth Amendment. *Jacobsen*, 466 U.S. at 124-25; *see also Bonds v. Cox*, 20 F.3d 697, 701-02 (6th Cir. 1994). Indeed, "[l]aw enforcement activities that unreasonably damage or destroy personal property, thereby 'seizing' it within the meaning of the Fourth Amendment, may give rise to liability under [section] 1983.'" *Newsome v. Erwin*, 137 F. Supp. 2d 934, 941 (S. D. Ohio 2000). Here, after being forced to pay over $24,000 for the return of her property, Ms. Fernandez (through her agent) discovered that her firearms had been significantly damaged while in LASD's custody, resulting in over $43,490 in lost value. RSUMF Nos. 118-21. The unjustified damage to Ms. Fernandez's seized property, alleged to have taken place during the initial seizure and transport under the direct supervision of Deputies Roth and Waldron, is independently actionable under the Fourth Amendment. The Individual Defendants, however, claim that they should not be held personally liable under the doctrine of qualified immunity because they were merely carrying out the duties of their positions with LASD. They are wrong.

"[Q]ualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). A defense of "qualified immunity will be defeated if an official '*knew or reasonably should have known* that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff]…." *Harlow*, 457 U.S. at 815 (quoting *Wood v. Strickland*, 420 U.S. 308, 322 (1975)). As this Court has already explained, "it was clearly established at the time of the seizure of the firearms that officers would be liable for unjustified damages." Order Re: Defs.' Mots. Dismiss at 11,

Sept. 28, 2022, ECF No. 53 (citing *Liston v. Cnty. of Riverside*, 120 F.3d 965, 979 (9th Cir. 1997), *Mena v. City of Simi Valley*, 226 F.3d 1031, 1041 (9th Cir. 2000)). The law then is plainly on Plaintiff's side. The Individual Defendants can prevail on summary judgment only if they can prove there is no genuine dispute that they could not have damaged Ms. Fernandez's firearms during the seizure. They cannot meet their burden.

The Individual Defendants themselves have practically admitted as much. While their moving papers state they "stored" and "transported" the firearms on a truck, Mot. 24 (citing Pls.' SUF No. 84), Deputy Waldron admitted that no "measures were taken to prevent damage" "during the transportation of this large collection of firearms." RSUMF No. 84. This is not standard procedure for the handling of firearms or other property. RSUMF No. 84. As Deputy Roth testified, "as a professional, I'm not going to take a bunch of guns and just dump them in the trunk of my car and bounce them back to my station for booking." RSUMF No. 84. Deputy Roth also explained that "[l]ong guns, whether it's a shotgun or a rifle, or muzzleloaders for that case, they would be placed in a manner that they would be laid down, not bouncing or riding on top of each other. There would have been towels or blankets or cardboard placed between them to prevent incurring damage." RSUMF No. 84. And it is undisputed that, before booking the firearms into evidence at the Palmdale Station, LASD officers sprawled the Fernandez firearms out on hard, bare cement without anything to protect them from scratches, dents, or other damage. RSUMF No. 90.

Curiously, the Individual Defendants argue only that Deputy Roth was careful in handling the firearms during the second Caprock Lane search where only about 100 additional firearms were seized: "In order to transport the firearms Deputy Roth placed the handguns into manilla envelopes, then into a receptacle to prevent them from sliding or moving around. Long guns were laid down with towels, blankets or cardboard placed between them to prevent damage." Mot. 24-25 (citing SUF No. 89). No similar claims of careful handling practices are made regarding Deputy Waldron—or anyone else present at the first search of the Caprock residence, for that matter. At most then, the argument

1  would absolve only Deputy Roth. But even Roth was present at and participated in laying

2  the Fernandez firearms on the cement for LASD's photo op before booking. Logan Decl.,

3  Ex. 11 [Roth Dep.] at 103:13-104:18. It is thus, at minimum, genuinely disputed whether

4  the Fernandez firearms were damaged by Deputies Roth and Waldron and/or their teams

5  during the initial seizures.

6       Even still, the Individual Defendants argue that Ms. Fernandez has no evidence of

7  the condition of the firearms before the seizure, so she cannot prove they were damaged

8  during the seizure. Mot. 25. To be sure, she may not have documentary evidence of the

9  firearms' condition, including pre-seizure pictures, appraisals, or insurance policies.

10  SUMF Nos. 64-68. But she has her memories of her time with her late husband and the

11  condition of the firearm collection he kept in the home they shared for years. She testified

12  at her deposition and submitted a declaration attesting to the manner in which Mr.

13  Fernandez used, kept, and cleaned his firearms, and she is prepared to do so at trial.

14  RSUMF Nos. 72, 76, 78, 80; Fernandez Decl., ¶¶ 3-5. Ms. Fernandez claims that her late

15  husband "generally kept [his firearms] in either the boxes and Styrofoam they came in, in

16  gun cases, or in large gun safes. If a gun did not come in a box or if he did not have room

17  in the gun cases or safes, he would wrap it in a towel, cloth, or something similar to

18  protect it." Fernandez Decl. ¶ 5; RSUMF No. 76. He also cared for them by cleaning them

19  immediately (or as soon as was possible) after taking them shooting and returning them to

20  their storage place. RSUMF No. 76.

21       Defendants, for their part, presented no documentary evidence of their own proving

22  that the firearms were already damaged when they found them. SUMF No. 122; RSUMF

23  No. 77. They did not describe the alleged damage in the police incident reports or

24  PRELIMS printouts generated at the time of the seizures. *See* Barvir Decl., Ex. G [LASD

25  Evidence & Property Page – Palmdale Station]; Logan Decl., Ex. 8 [Incident Report Re:

26  6/14/18 Search at Caprock Road], Ex. 13 [Incident Report Re: 6/20/18 Search at Caprock

27  Road], Ex. 14B [[LASD Chain of Custody Report / PRELIMS]. They took very few

28  photographs at the scene when the firearms were discovered. *See* Barvir Decl. Ex. N-4 at

OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

624-30, 639, 641-43. And the only pictures showing the condition of individual firearms (of which there are also shockingly few) were taken at the Palmdale Station after they had been removed from their packaging, tossed into the bed of a pickup truck for transport, laid on the hard cement for a photo op, and stuffed by the dozens into plastic bins. *See id.*, Ex. N-1 at 591-97, Ex. N-2 at 599-604, Ex. N-3 at 606-614, Ex. N-4 at 631-33, 637. What's more, Deputy Roth conceded that he was "unable to see the seizure or the condition of the items seized prior to [his] arrival, so anything [he commented as to that], would be speculative on the condition." Logan Decl., Ex. 11 [Roth Dep.] at 78:16-24. [9] Deputy Waldron only personally handled a few dozen of the more than 500 guns seized. SUMF No. 13; RSUMF No. 77. And Defendants present no admissible evidence that "the majority of the firearms were old, not well cared for, and simply strewn about." *Compare* SUMF No. 76 *with* RSUMF No. 76; Pls.' Sep. State. Evidentiary Obj. No. 30. Deputy Roth, to whom this statement is attributed, admitted that he was only present "on the back end of the—the tail part of the initial [Caprock] search, and the vast majority of firearms had already been seized." Logan Decl., Ex. 11 [Roth Dep.] at 77:7-9. He also admitted that whatever damage he claimed to have observed during the first search was to guns "that were already seized prior to [his] arrival." *Id.* at 77:10-24.

Finally, Defendants argue (again) that Roth and Waldron did not violate clearly established law. Mot. 26-31. But this Court has already held that "it was clearly established at the time of the seizure of the firearms that officers would be liable for unjustified damages." Order Re: Defs.' Mots. Dismiss at 11, Sept. 28, 2022, ECF No. 53 (citing *Liston v. Cnty. of Riverside*, 120 F.3d 965, 979 (9th Cir. 1997), *Mena v. City of Simi Valley*, 226 F.3d 1031, 1041 (9th Cir. 2000)). That is the law of the case, and that doctrine "ordinarily precludes reconsideration of a previously decided issue." *United*

---

[9] Even if the firearms were already partially damaged before the seizure, which Ms. Fernandez denies, that would not absolve Deputies Roth or Waldron of *additional* damage caused during the seizure.

OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

*States v. Alexander*, 106 F.3d 874, 877 (9th Cir. 1997). But even if Defendants could advance an argument on a decided question, Defendants merely reassert that they did not cause unjustified damage to the firearms. They do not actually argue that the right at issue was not clearly established, besides in its subheading's title. Mot. 26 (titled "There Is No Evidence That Roth or Waldron Violated the Clearly Established Law"). In other words, Defendants are simply arguing—again—that there could be no violation of the Fourth Amendment because the firearms were allegedly damaged before the seizure. That is distinct from arguing the right alleged to have been violated was not clearly established.

In sum, if this Court agrees with Ms. Fernandez that the material facts are disputed as to whether there was unreasonable damage caused during the initial seizure, then there can be no summary judgment for the Individual Defendants based on qualified immunity. Given that it was clearly established at the time of the seizure that officers would be liable for unjustified damage they caused, the only question is whether they caused unjustified damage. And that question is genuinely disputed.

## II.   DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THE NEGLIGENCE CLAIMS BECAUSE THERE IS A GENUINE DISPUTE OVER WHETHER DEFENDANTS BREACHED THEIR DUTY OF CARE, RESULTING IN DAMAGE TO THE FERNANDEZ FIREARMS

Ms. Fernandez also brings a state-law claim for negligence against all Defendants for their failure to exercise due care when executing the seizures, resulting in substantial damage to the Fernandez firearms. "The elements of a cause of action for negligence are well established. They are a legal duty to use due care, a breach of that legal duty, and the breach as the proximate or legal cause of the resulting injury." *Ladd v. Cnty. of San Mateo*, 12 Cal. 4th 913, 917 (1996) (quoting *Evan F. v. Hughson United Methodist Church*, 8 Cal. App. 4th 828 (1992)).

Defendants do not dispute that they owed a duty of care to Ms. Fernandez, so the only relevant questions are whether they breached that duty and damage resulted. There is, at least, a genuine dispute of material fact as to each of these elements, so Defendants are not entitled to summary judgment.

**A.    The County Is Liable for the Negligence of Its Employees Under Government Code Section 815.2**

Defendants' arguments that Ms. Fernandez will provide no evidence to prove her claim for negligence against the County are based on a fundamental misunderstanding of the claim Ms. Fernandez brings and the application of relevant state laws governing the tort liability of public entities.

First, Ms. Fernandez must clarify that her negligence claim emerges from the damage to the Fernandez firearms and *not* from the County's imposition of an unlawful firearm release fee. First Am. Compl. ¶¶ 116-21. In fact, the third claim for relief (the negligence claim) in the operative complaint does not reference the firearm release fee at all. *Id.* The County's argument that Ms. Fernandez cannot prove her negligence claim against the County because she "identifies no statute [that] imposes *direct* liability on the County … *for charging the firearm fee at issue here*" is thus little more than a strawman set up to disguise the County's liability for the damage to the Fernandez firearms. Mot. 33 (second emphasis added).

Second, it is a little puzzling that Defendants argue that Ms. Fernandez has failed to allege that the County is "*directly*" liable for the harms she suffered or that there is a "specific statute" imposing direct tort liability on the County. Mot. 32 (citing *Eastburn v. Reg'l Fire Prot. Auth.*, 31 Cal. 4th 1175, 1179-80 (2003)). As Defendants' motion itself recognizes, Ms. Fernandez does not allege that the County is directly liable for the damage to her property. *Id.* Instead, she claims that the County is liable for the negligence of its employees, including (but not limited to) Deputies Roth and Waldron, during the seizure, transport, handling, and storage of her property. First Am. Compl. ¶ 120 (citing Cal. Gov't Code § 815.2). Under California law, "[t]he general rule is that an employee of a public entity is liable for his torts to the same extent as a private person." *Koussaya v. City of Stockton*, 54 Cal. App. 5th 909, 944 (2020) (quoting Cal. Gov't Code § 820(a)). "[A]nd the public entity is vicariously liable for any injury which its employee causes [citation omitted] to the same extent as a private employer." *Id.* (citing Cal. Gov't Code §§

815(b), 815.2(a)). To be sure, section 820.2 protects public employees who cause injuries resulting from an "act or omission [that] was the result of the exercise of the discretion vested in" them. *Id.* (quoting Cal. Gov't Code § 820.2). But California courts have held that immunity does not apply when, as here, "the injury to another results, not from the employee's exercise of 'discretion vested in him' to undertake the act, *but from his negligence in performing it after having made the discretionary decision to do so*." *McCorkle v. City of Los Angeles*, 70 Cal.2d 252, 261 (1969) (quoting *Johnson v. State of California*, 69 Cal.2d 782, 796-97 (1968)) (emphasis added). Because a cause of action for negligence may be properly brought against LASD employees, the County is vicariously liable under the express terms of section 815.2.

Third, the County does not even attempt to argue that it is *not* liable for its employees' negligence. Mot. 32-33. Instead, it argues only that Deputies Roth and Waldron were not themselves negligent in the execution of the warrant and initial seizure, and thus the County has no vicarious liability. Mot. 33-37. If this Court agrees that, at minimum, there is a genuine dispute of fact over whether the deputies (and/or their teams)[10] were negligent in the execution of the warrants and that damage resulted, the County is not entitled to summary judgment on the negligence claim.

Moreover, the negligence claim against the County (via its employees' misconduct) is in no way limited to the acts or omissions of Deputies Roth and Waldron during the initial execution of the seizure. The claim also involves the negligence of all LASD employees who participated in the transportation, handling, and storage of the Fernandez firearms and the allegedly resulting harm—even after the act of seizing the property. First Am. Compl. ¶¶ 117-21. To be sure, this Court dismissed on qualified immunity grounds the theory that, *under the Fourth Amendment*, the County and its employees are liable for

---

[10] While Defendants do not argue this point, it should be noted that Deputies Roth and Waldron may be held liable for the negligence of those they were supervising and directing to act during the Caprock seizures they each led. *Michel v. Smith*, 188 Cal. 199, 201 (1922) (holding that a police officer is not responsible for acts of subordinates unless he has directed such acts to be done or personally cooperated); SUMF Nos. 109-110.

OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

damage to seized property after the execution of the warrant. Order Re: Defs.' Mots. Dismiss 11-12, Sept. 28, 2022, ECF No. 53. But that does not mean the County and its employees are shielded from tort liability for their negligent acts and omissions related to the handling and storage of the seized property. The Defendants did not move to dismiss the supplemental state-law claims against them apart from arguing they should be dismissed because the federal claims should be dismissed. Cnty. Defs.' Mot. Dismiss First Am. Compl. 17, ECF No. 44; Cnty. Emps.' Mot. Dismiss First Am. Compl. 11-12, ECF No. 45. And the Court therefore did not address the merits of the tort claims at all, summarily denying the Defendants' request to dismiss the state-law claims. Order Re: Defs.' Mots. Dismiss 12, Sept. 28, 2022, ECF No. 53.

Because, as discussed below, there is (at least) a genuine dispute over whether the County's employees, including Deputies Roth and Waldron, breached their duty of care and damaged Ms. Fernandez's property, the County is not entitled to summary judgment on the negligence cause of action.

### B. There Is a Genuine Dispute Over Whether LASD Employees, Including Deputies Roth and Waldron, Breached Their Duty of Care and Damaged the Fernandez Firearms

Believing the firearms were likely to be destroyed (not returned) as is usually the case when guns are seized from prohibited persons, SUMF No. 53, Logan Decl., Ex. 14 [Brown Decl.] at ¶ 27, LASD employees exercised very little, if any, care in the seizure, transport, handling, and storage of Ms. Fernandez's firearms. Their failure to do so arguably resulted in tens of thousands of dollars in damage to her property. Deputies Roth and Waldron are both personally liable for their negligent execution of their duties during the execution of the Caprock search warrants. And the County is responsible for Roth and Waldron's negligence, as well as the negligence of every employee responsible for seizing, transporting, handling, and storing the firearms. Cal. Gov't Code § 815.2.

Defendants do not even attempt to defend against the allegedly negligent handling and storage of the firearms by various LASD employees, including (but not limited to) Property Custodian Susan O'Leary Brown, Deputy Richard Leon, and CPE personnel.

*Compare* Mot. 3-37 *with* First Am. Compl. ¶¶ 11-19, 52-57, 60. They present neither argument nor evidence tending to show that due care was taken with regard to the firearms once the initial seizure had ended. And their argument that Deputies Roth and Waldron did not breach their duty of care during the execution of the search warrants is built entirely on a foundation of genuinely disputed facts. Mot. 33-37.

First, Ms. Fernandez disputes the claim that she does not know how many firearms her husband possessed or their condition when seized. Mot. 33-34. She testified in deposition and is prepared to prove at trial that her late husband was "passionate" about his gun-collecting hobby and that he generally took great care to protect his guns from damage and unnecessary wear. Logan Decl., Ex. 2 [Fernandez Dep.] at 24:3; Fernandez Decl. ¶ 3. Ms. Fernandez has declared that she knew that her late husband carefully stored most of his firearms in either the boxes that they came in, gun cases, or gun safes, or he otherwise wrapped them in cloths, towels, or similar materials to prevent damage. RSUMF No. 72; Fernandez Decl. ¶ 5. And she testified that her late husband cared for his firearms by cleaning them immediately (or as soon as possible) after taking them shooting. SUMF No. 72. The firearms were not simply "strewn about" or "not well cared for," as the Defendants claim. Mot. 34. At the very least, Defendants have not provided undisputed, admissible evidence of their claim sufficient to rebut Ms. Fernandez's testimony at this stage.

Next, Defendants argue that, before the seizure, the conditions in which the firearms were stored were poor, Mot. 34, but evidence of this claim is weak, at best. For instance, Defendants point out that Mr. Fernandez stored some of his firearms in a garage without air conditioning. Mot. 34. But nowhere is the significance of that fact explained, and Defendants present no evidence that a hot environment causes any damage to firearms at all—let alone the sort of damage at issue here (e.g., scratches, dings, mars, cracks, Watson Decl., ¶ 7). Nor could they. Firearms are designed to handle and contain *gunpowder explosions*, sometimes several in quick succession. Short of a house fire, storage in a hot garage does not, in and off itself, cause damage to firearms, and Defendants do not

demonstrate otherwise. Similarly, Defendants note that the firearms had "packing grease" on them, Mot. 34, but gun grease (like Cosmoline) is a popular product that is commonly used to *protect* firearms from rusting and other damage, particularly during long-term storage. *See* Wikipedia, Cosmoline, https://en.wikipedia.org/w/index.php?title=Cosmoline&oldid=1217667943 ("The most common use of Cosmoline is in the storage and preservation of some firearms, hand tools, machine tools and their tooling, and marine equipment.") If Defendants' claims that some guns were covered with "packing grease" are true, SUMF No. 75, it tends to prove that Mr. Fernandez took affirmative measures to *protect* his guns from damage, including rust, during storage—not that the guns were poorly kept.

Third, Defendants emphasize that, at some point in his life, Mr. Fernandez regularly took his beloved guns shooting. Mot. 28. The argument, like the packing grease claim, cuts *against* Defendants' argument, not in favor of it. That is because, if true, Mr. Fernandez's use of the guns demonstrates that they were at least well-maintained enough to fire. In any event, Ms. Fernandez has testified that her late husband went shooting less and less as he got older, so any firearms added to his collection later in life would not have been fired much. SUMF No. 70.

Fourth, Defendants' claim that the firearms were not in "pristine" condition, Mot. 34 (citing SUMF No. 75), has little bearing on this case. A duty of care is not only owed to property in brand new condition. Nor does Ms. Fernandez claim that all the firearms were in perfect condition at the time of the seizure. RSUMF No. 75. Indeed, given the age and type of many of the firearms, the expert valuation report assumes that they were not in such a condition. RSUMF No. 75. Even if the firearms were stored poorly and already damaged—"facts" that are genuinely in dispute—it does not mean that *additional* damage was not done to them during the search and seizure. Even if all the Defendants' claims about how Mr. Fernandez stored his firearms were true, and even if some guns had "scratches or dings" before the search, Mot. 34, the degree to which they were further damaged is a disputed question of fact.

Indeed, the evidence shows that, during the first Caprock seizure, "the majority of [the] firearms" were transported on the bed of a pickup truck without any material placed between them to prevent damage. SUMF No. 14; RSUMF No. 84. This is not standard procedure for the handling of firearms or other property. RSUMF No. 84. As Deputy Roth testified during is deposition, "as a professional, I'm not going to take a bunch of guns and just dump them in the trunk of my car and bounce them back to my station for booking." RSUMF No. 84. He also explained that "[l]ong guns, whether it's a shotgun or a rifle, or muzzleloaders for that case, they would be placed in a manner that they would be laid down, not bouncing or riding on top of each other. There would have been towels or blankets or cardboard placed between them to prevent incurring damage." *Id*. It is also undisputed that, before booking the firearms into evidence, LASD deputies and detectives, including Deputies Roth and Waldron, sprawled the seized firearms out on hard, bare cement without anything to protect the firearms from scratches, dents, or other damage. RSUMF No. 90. Defendants' motion makes it sound as if this was somehow a necessary step, Mot. 36, but it was not. It was done purely so that LASD could boast about the biggest gun seizure in its history. Logan Decl., Ex. 11 [Roth Dep.] at 54:22-25.

Suffice it to say, whether the County's employees, including Deputies Roth and Waldron, exercised the appropriate level of care in carrying out their duties with regard to the Fernandez firearms or whether they breach their duty to do so is genuinely disputed. The issue cannot be disposed of on summary judgment.

III.   **DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THE TRESPASS TO CHATTELS CLAIM BECAUSE THERE IS A GENUINE DISPUTE OVER WHETHER DEFENDANTS INTENTIONALLY INTERFERED WITH MS. FERNANDEZ'S POSSESSORY INTEREST IN HER FIREARMS**

Trespass to chattels "allows recovery for interference with possession of personal property 'not sufficiently important to be classed as conversion." *Intel Corp. v. Hamidi*, 30 Cal. 4th 1342, 1350 (2003) (citing W. Page Keeton, et al., *Prosser and Keeton on Law of Torts* § 14, pp. 85-86 (5th ed. 1984)). Under California law, an actionable trespass to chattels "lies where an intentional interference with the possession of personal property"

28

OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

proximately causes injury. *Id.* at 1350-51 (quoting *Thrifty-Tel, Inc. v. Bezenek*, 46 Cal. App. 4th 1559, 1566 (1996)); *Jamgotchian v. Slender*, 170 Cal. App. 4th 1384, 1401 (2009). "In cases of interference with possession of personal property not amounting to conversion, 'the owner has a cause of action for trespass'" for both "the impairment of the property [and] the loss of its use." *Jamgotchian*, 170 Cal. App. 4th at 1401. Defendants intentionally interfered with Ms. Fernandez's possessory interest in her late husband's valuable firearm collection, causing harm that does not quite constitute conversion, in both ways.

First, the County, through its employees, intentionally refused to return Ms. Fernandez's seized property unless she agreed to pay an unlawful fee of $24,354.00, causing Ms. Fernandez to suffer an unreasonable delay in retrieving her legal property. That said, because public employees are immune from liability for injuries caused "in the execution or enforcement of any law" when "exercising due care," Cal. Gov't Code § 820.4, the County cannot be held to be vicariously liable, *id.* § 815.2. Ms. Fernandez thus disclaims her theory that Defendants are liable for trespass to chattels because they intentionally refused to release her seized firearms subject to an unlawful fee demand.

Second, however, Ms. Fernandez maintains that the County, through its employees, intentionally interfered with Ms. Fernandez's interest in her firearms when seizing, transporting, handling, and storing them, resulting in nearly $50,000 in damage. As discussed in Section II.B., *supra*, a genuine dispute over a triable issue of fact exists as to whether the County's employees' misconduct, including that of Deputies Roth and Waldron, resulted in the damage to Ms. Fernandez's property. For that reason, Ms. Fernandez's trespass to chattels claim must survive summary judgment.

## IV. DEFENDANTS DO NOT ARGUE THEY ARE ENTITLED TO SUMMARY JUDGMENT ON THE BREACH OF CONSTRUCTIVE BAILMENT CLAIM

Defendants make a convincing argument that no traditional bailment occurred here. Mot. 38-39. Plaintiff does not dispute it. That is why she never alleged a conventional bailment occurred. Rather, the operative complaint alleges that the seizure of the firearms

created an *involuntary* bailment. First Am. Compl. ¶ 123. Ms. Fernandez need not offer evidence that any voluntary delivery occurred, that there was a contract or mutual intent based on consideration, or the existence of any "promise, representation, statement, or assertion by the County, Deputy Roth, or Deputy Waldron that would have created an express implied-in-fact bailment contract with her." Mot. 38-39.

In California, "[b]ailments may be voluntary or involuntary." *Gebert v. Yank*, 172 Cal. App. 3d 544, 551 (Ct. App. 1985). Involuntary bailments, also known as "constructive" bailments, have been described as follows:

> It is the element of lawful possession, and the duty to account for the thing as the property of another, that creates the bailment, whether such possession results from contract or is otherwise lawfully obtained. It makes no difference whether the thing be intrusted to a person by the owner or by another. Taking lawful possession without present intent to appropriate creates a bailment.

*Morgan Stanley & Co. v. JP Morgan Chase Bank, N.A.*, 645 F. Supp. 2d 248, 256 (S.D.N.Y. 2009) (quoting *Pivar v. Grad. Sch. of Figurative Art of the N.Y. Acad. of Art*, 735 N.Y.S.2d 522, 524 (1st Dep't 2002)).

An *involuntary* bailment does not require the bailor's express assumption of a bailee's duties, and it may arise as an operation of law "where a person comes into lawful possession of the personal property of another, even though there is no formal agreement between the property's owner and its possessor ... when justice so requires." *Alitalia v. Arrow Trucking Co.*, 977 F. Supp. 973, 980-81 (D. Ariz. 1997) (quoting *Christensen v. Hoover*, 643 P.2d 525, 529 (Colo.1982)); *see also Wikiert v. City of New York*, 128 A.D.3d 128, 132 (2015) (holding that the city's possession of the plaintiff's property, following the plaintiff's arrest, constituted a bailment). What's more, and even more to the point, California has long recognized that "the government in effect occupies the position of a bailee when it seizes from an arrestee property that is not shown to be contraband." *Minsky v. City of Los Angeles*, 11 Cal. 3d 113, 121 (1974) (citing *Mozzetti v. Super. Ct.*, 4 Cal.3d 699, 708-09 (1971) (declaring that the police are involuntary bailees of vehicles

impounded after a traffic accident).)

There is no dispute that the Fernandez firearms were seized and loaded into the bed of a truck and in the backs of squad cars without regard to damaging them, SUMF No. 14, subsequently laid on concrete for a photo op, RSUMF No. 90, and moved back and forth between multiple locations while stored in bins, SUMF Nos. 47, 118. Ms. Fernandez alleges that this reckless behavior caused damage breaching the bailment, making Defendants liable for that damage. Cal. Civ. Code § 1836. While Defendants deny that such damage occurred while they had possession of the Fernandez firearms, that is a disputed question of fact that cannot be disposed of on summary judgment.

As Defendants' moving papers do not argue against anything but a strawman claim Ms. Fernandez never made, this Court should disregard any new argument from Defendants as to involuntary or constructive bailments made for the first time on reply. *Autotel v. Nev. Bell Tel. Co.*, 697 F.3d 846, 852 n. 3 (9th Cir. 2012) ("[A]rguments raised for the first time in a reply brief are waived.").

**V.     IF MS. FERNANDEZ'S CONSTITUTIONAL CLAIM SURVIVES SUMMARY JUDGMENT, SHE IS ENTITLED TO DECLARATORY RELIEF**

Defendants challenge Ms. Fernandez's claim for declaratory relief, arguing that because that claim requires that she succeed on her other claims, she is not entitled to declaratory relief if she loses those other claims. Mot. 42. Ms. Fernandez agrees. But the reverse is also true, of course. If this Court agrees that Ms. Fernandez's Fourth Amendment claim survives this motion, then her declaratory relief claim necessarily survives as well.

**VI.    MS. FERNANDEZ WAIVES HER CLAIM FOR PUNITIVE FEES AGAINST THE COUNTY**

Ms. Fernandez does not oppose the County's request that her request for punitive fees against the County, a public entity, be dismissed. Mot. 42 (citing *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981); Cal. Gov't Code § 818).

/ / /

1

## CONCLUSION

2      For these reasons, the Court should deny Defendants' motion for summary

3 judgment.

4

5 Dated: April 12, 2024                    **MICHEL & ASSOCIATES, P.C.**

6

7                                          *s/ Anna M. Barvir*

8                                          Anna M. Barvir
                                           Attorneys for Plaintiff

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Plaintiff Ana Patricia Fernandez, certifies that this brief contains 11,544 words, which complies with the word limit set by court order dated March 15, 2024.

Dated: April 12, 2024
                                                    *s/ Anna M. Barvir*
                                                    Anna M. Barvir

**CERTIFICATE OF SERVICE**
IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

Case Name: *Fernandez, v. Los Angeles County, et al.*
Case No.:    2:20-cv-09876 DMG (PDx)

IT IS HEREBY CERTIFIED THAT:

      I, the undersigned, am a citizen of the United States and am at least eighteen years of age. My business address is 180 East Ocean Boulevard, Suite 200, Long Beach, California 90802.

      I am not a party to the above-entitled action. I have caused service of:

**PLAINTIFF'S OPPOSITION TO DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

on the following party by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

Amber A. Logan
amberlogan@lmhfirm.com
lmh@lmhfirm.com
Logan Mathevosian & Hur LLP
3435 Wilshire Blvd., Suite 2740
Los Angeles, CA 90010
   *Attorneys for Defendants Los Angeles County,*
   *Wyatt Waldron, and John Roth*

      I declare under penalty of perjury that the foregoing is true and correct.

Executed April 12, 2024.

Laura Palmerin